[No. C034462. Third Dist. May 10, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY RONALD FRANZ, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III, IV, V.A, and V.B of the DISCUSSION.

## COUNSEL

Kathryn Houck, under appointment of the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—Defendant Anthony Ronald Franz appeals from a judgment following conviction on one count of spousal battery (Pen. Code, § 243, subd. (e)), two counts of making terrorist threats (§ 422),[1] two counts of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)), one count of battery (§ 243, subd. (e)(1), and one count of assault and battery (§ 242). The trial court found true and imposed a one-year enhancement for a prior prison term. (§ 667.5, subd. (b).)

In the published portion of the opinion, we consider and reject defendant's contention that there is no substantial evidence he made a verbal "statement" to support the terrorist threat convictions. However, we agree with defendant that the trial court erroneously found true the prior prison term enhancement, which was founded on a federal conviction for possession of counterfeit United States currency.

Defendant also raises other contentions of insufficient evidence, evidentiary error, instructional error, and sentencing error, all of which we reject in the unpublished portion of the opinion.

We shall reverse the trial court's finding that the section 667.5 enhancement was true and remand to the trial court for a retrial of the enhancement. We shall also order correction of the abstract of judgment to stay the sentences on the section 422 counts (counts 3 and 4) and strike the prior prison term enhancement. We shall otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

By an information filed in September 1999, defendant was charged with: (1) inflicting corporal injury on cohabitant Erika Schmidt between June 15, 1999, and July 4, 1999 (§ 273.5); (2) making a terrorist threat to Erika Schmidt on July 31, 1999 (§ 422); (3) making a terrorist threat to Matthew Zook on July 31, 1999 (§ 422); (4) making a terrorist threat to Jordan Immer

---

[1] Undesignated statutory references are to the Penal Code.

Section 422 provides in part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

on July 31, 1999 (§ 422); (5) attempting on July 31, 1999, to dissuade Erika Schmidt from reporting a crime to law enforcement officers (§ 136.1, subd. (b)(1)); (6) attempting on July 31, 1999, to dissuade Matthew Zook from reporting a crime (§ 136.1, subd. (b)(1)); (7) attempting on July 31, 1999, to dissuade Jordan Immer from reporting a crime (§ 136.1, subd. (b)(1)); (8) using force and violence on July 31, 1999, upon Erika Schmidt, a person with whom defendant had a previous dating relationship (§ 243, subd. (e)(1)); (9) using force and violence on July 29, 1999, upon Erika Schmidt, a person with whom defendant had a previous dating relationship (§ 243, subd. (e)(1)); and (10) using force and violence on July 31, 1999, upon Matthew Zook (§ 242).

The following evidence was adduced at trial:

Erika Schmidt (age 20) testified that defendant (age 28) was a former boyfriend who lived with her briefly. They fought often. In mid-June 1999, defendant hit her and tried to choke her at Benham Park after expressing anger that Schmidt received a telephone call from a male friend. Around the end of June 1999, Schmidt and defendant broke up (though he continued to drive her home from work), and defendant moved in with neighbor Judy Pena.

On the evening of July 29, 1999, while Schmidt was a passenger in defendant's car, defendant asked to borrow money from Schmidt. They stopped for gasoline at an AM/PM store, where some "kids" approached and asked defendant to buy beer for them. He agreed to do so (testimony that was admitted over defense objection). While defendant was in the store, Schmidt saw in defendant's car a photograph of two of her sister's friends, ages 12 and 13, with their legs spread open. She told him it was disgusting. He said it was not his, and he hit her several times, bruising her eye and cutting the back of her ear. Schmidt was afraid of defendant because he previously told her she would be sorry if she called the police on him. Schmidt's mother reported the incident to the police.

On the afternoon of July 31, 1999, Schmidt was on the street near her workplace, waiting for a taxi to take her home, conversing with her sister's 17-year-old boyfriend, Matthew Zook, and Zook's 17-year-old friend, Jordan Immer. Schmidt saw defendant's car and ducked into a nearby pizza restaurant and went into the restroom to avoid him. When she emerged, Zook said defendant "got in his face."

Schmidt, Zook and Immer took a taxi to Schmidt's home, where she shut all the curtains and locked all the doors, because she was afraid of defendant.

The phone rang repeatedly, but she did not answer. Defendant came knocking on her door, but she did not answer. Schmidt, Zook and Immer stayed in a bedroom, which was "movie theater dark" with the blackout curtains closed, but with some daylight coming in through the open hallway door. When defendant tried to gain access to the house through a window, Schmidt agreed to go outside to speak with him. When she opened the door, he pushed his way inside. He asked who was with her; she said no one. Defendant found Zook and Immer in the bedroom, called Schmidt a liar and slapped her face as she stood in the living room. Defendant then turned on the bedroom light and hit Zook on the face several times with a closed fist, yelling that he (defendant) wanted Zook to telephone and apologize to Zook's aunt (Judy Pena) for calling her a whore. Schmidt grabbed a cordless phone, ran out of the house, and called the police. She hung up when she saw defendant coming after her. He took the phone and punched her several times, causing her nose to bleed. He pulled her back inside the house, told her "I'm going to fucking kill you," and resumed yelling at Zook in the bedroom.

The police arrived. Schmidt ran outside, crying. She heard defendant tell the officers that she had fallen down the stairs. At first, Schmidt did not tell the officers what happened, because she was afraid of defendant, but she spoke to the police after being taken to the hospital.

Schmidt admitted she was jealous of defendant's new girlfriend, Judy Pena, and admitted she made telephone calls to Pena's house, but said the calls she made were to return defendant's calls to her.

A tape recording of Schmidt's 911 call was played for the jury; on it was heard the yelling of a male voice, which Schmidt identified as defendant's voice. A transcription of the 911 tape reads as follows:

"911 Operator: 911 emergency.

"[Schmidt]: Please help me! Help me! Help me!

"911 Operator: What's going on?

"[Schmidt]: 5635 Canal Street.

"911 Operator: What's happening?

"[Schmidt]: Hurry! Hurry! Hurry! Please! No! Please help me!

"911 Operator: What's happening to you?

"END OF CALL [¶] . . . [¶]

"[Defendant]: Fucker![2]

"911 Operator: Hello! Hello! This is 911.

"[Defendant]: Want to fucking talk (unintelligible) me of being drunk, huh? You'd better fucking watch your mouth!

"911 Operator: Hello!

"[Defendant]: I'm not no fucking little kid. I'll fucking kill you, boy! . . . (unintelligible) . . . You (unintelligible) you mother fucking . . . (unintelligible)

"911 Operator: I can hear males arguing.

"[Defendant]: (unintelligible) . . . shit! I'll fuck you up! I don't give a fuck about going back to the pen! I got connections, bro! My family is Mafia! Mafia! (unintelligible)

"911 Operator: Hello, this is 911.

"[Defendant]: . . . give a fuck! You'd better leave your mother-fucking aunt alone! And . . . Apologize to her! If you don[']t . . .

"911 Operator: (unintelligible)

"[Defendant]: . . . play it cool for you. (unintelligible) from here. I got a fucking calling card.

"Unknown voice: (unintelligible)

"[Defendant]: Don't worry about it. You're going to apologize. I'm going to call her right now.

"(unintelligible)

"END OF CALL."[3]

Matthew Zook testified. He witnessed the incident in which defendant hit Schmidt in the park. Regarding the July 31, 1999, incident at Schmidt's

---

[2]It would appear the 911 operator then called back.
[3]The transcription contained in the augmented clerk's transcript on appeal bears a notation that it was not admitted into evidence, but other notations in the record indicate it was

home, Zook was afraid of defendant because a couple of days earlier, defendant threatened Zook, saying he was going to kill Zook, Zook's girlfriend (Schmidt's sister), and his girlfriend's family. Zook did not know why defendant was mad at him, other than the fact he associated with the Schmidts. At the pizza restaurant, defendant threatened to kill Zook. At Schmidt's house, Zook hid in the bedroom with Immer and heard Schmidt at the front door screaming "no, Tony," and hitting sounds. Defendant came into the bedroom and hit Zook three times with a closed fist, blurring Zook's vision. Defendant demanded that Zook call his aunt and apologize for calling her a whore. Zook made the call.

Zook said that when the police arrived, he "wasn't scared then because they were there because I felt threatened still [*sic*] . . . [b]y [defendant]." Officer Jacobs came into the bedroom where Zook and Immer were sitting on the bed. Zook saw defendant standing behind the officer; defendant "did a gesture like this, like shush. And then ran his finger across his throat." The record reflected Zook showed an index finger in front of the lips and then held up a thumb and ran it across his throat. Zook said defendant looked right at Zook's eyes as he did this. Immer was also sitting on the bed. The officer was between the bed and the door with his back to the door. Zook understood defendant was threatening to "cut my throat" if Zook said anything to the officer. Zook took the threat seriously. Later that evening, Zook and Immer were walking home when Officer Santos pulled over and said he knew what had happened at the Schmidt house. Because defendant was not present, Zook told "what defendant had done." Zook did not recall if he told the officer about defendant's "silence motion and the cutting the throat motion."

Jordan Immer testified he was in the bedroom and heard hitting sounds at the front door and Schmidt crying. Defendant came into the bedroom and hit Zook. Immer was scared. When the police arrived, Officer Jacobs came into the bedroom and stood by the bed where the boys were sitting. Immer did not answer the officer's questions, because defendant was in the bedroom, behind the officer, and defendant "swiped his hand across his throat" perhaps twice, shook his head and put his finger to his lips, which Immer understood to mean defendant would slice his throat if he said anything to the police. Immer testified he did not recall if defendant said anything at that point. After the police left, defendant told them not to say anything. Later, Immer saw the police as he was walking home and told them what happened because he no longer felt threatened. Immer testified at trial that he never saw defendant hit Schmidt and denied having told the police he saw it.

admitted into evidence. Because both sides on appeal cite to the transcription, we assume the parties agree it was admitted in evidence.

Officer John Jacobs testified that when he arrived at Schmidt's home, she ran past him, and he did not see her injuries until later. Defendant said he and Schmidt got into an argument about her "harboring juveniles" in her home. Officer Jacobs went into the bedroom to speak with the two juveniles, but they would not answer his questions. The officer did not see any injuries on Zook, but the room was semidark. During the several minutes the officer spent in the bedroom with his back to the door, the officer was not aware of anyone coming into the room. The officer left the bedroom, saw defendant in the living room, told him to go home, and escorted him out of the house. It was not until after defendant left that Officer Jacobs saw that Schmidt had a bloody nose and other fresh injuries. She said nothing happened, but she wanted a restraining order against defendant.

On cross-examination, Officer Jacobs testified his instincts were developed with 20 years' experience, and no one could have "snuck up behind [him] in that bedroom."

Officer Frank Santos testified he spoke to Schmidt at the hospital, and she told him what happened. Later that evening, he came into contact with Zook and Immer, told them he had already learned from Schmidt what happened and knew they were scared. Officer Santos spoke with Zook and Immer separately; each gave a similar account of the incident corresponding with Schmidt's account. Each boy said he came out of the bedroom and saw defendant hitting Schmidt. Zook indicated defendant made a verbal statement and physical gesture not to talk to the police. Officer Santos testified "[t]he verbal statement was noise coming out. . . . What I understood was that shush and a swipe across the throat. I don't mean the actual say this or say that [sic]. I mean a noise that they [sic] made and it was interpreted to them don't talk to the police. . . . Some sort of noise, shushing noise. I believe one said he actually heard the noise and there was a finger to the mouth."

The defense presented evidence that Schmidt falsely claimed to be pregnant with defendant's child, and that Schmidt would provoke defendant to anger by calling him names and "pushing his buttons."

During a break in the presentation of defendant's case, the trial court granted the prosecutor's request to dismiss counts 2 and 5, terrorist threat with respect to Schmidt and attempting to dissuade a witness with respect to Schmidt.

The jury returned verdicts finding defendant guilty on the following counts: spousal battery in violation of section 243, subdivision (e), as a

lesser included offense to the charge of corporal injury to spouse alleged in count 1; terrorist threat against Matthew Zook in violation of section 422 (count 3); terrorist threat against Jordan Immer in violation of section 422 (count 4); dissuading witness Matthew Zook from reporting a crime in violation of section 136.1, subdivision (b)(1) (count 6); dissuading witness Jordan Immer from reporting a crime in violation of section 136.1 (count 7); battery on Erika Schmidt in violation of section 243, subdivision (e)(1) (count 8); and assault and battery on Zook (count 10).

The jury also returned verdicts finding defendant *not* guilty on the following counts: Corporal injury to spouse (count 1); and battery (count 9).

The court allowed amendment of the pleading to allege a prior prison term enhancement under section 667.5, subdivision (b). In a bifurcated proceeding, the trial court found the enhancement allegation true, based on a prior federal conviction for possession of counterfeit United States currency with intent to defraud in violation of 18 United States Code section 472.

The trial court denied probation and sentenced defendant to a total term of four years and eight months as follows: the upper term of three years on count 6 as the principal term (dissuading Zook from reporting a crime); concurrent three-year upper terms on counts 3 and 4 (terrorist threats); a consecutive eight months (one-third the middle term) on count 7 (dissuading Immer from reporting a crime); a one-year enhancement under section 667.5 to run consecutive to count 6; two one-year jail terms on counts 1 and 8 (spousal battery and battery) to run concurrently with count 6; a six-month jail term on count 10 (battery) to run concurrently with count 6.[4]

### DISCUSSION

I. *Evidentiary Rulings**

. . . . . . . . . . . . . . . . . . . . . . . . .

II. *Sufficiency of the Evidence*

■ Defendant contends the evidence is insufficient to support his convictions for terrorist threats or dissuading a witness. We disagree.

In reviewing whether the evidence is sufficient to support a criminal conviction, we ask whether any rational trier of fact could have found the

---

[4]The concurrent sentences on the misdemeanors in counts 1, 8, and 10 are not mentioned in the abstract of judgment.

*See footnote, *ante*, page 1426.

essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) A judgment supported by the testimony of witnesses who have not been discredited and whose testimony is not inherently improbable will be affirmed. (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Appeal, § 150, p. 397, and cases cited therein.)

### A. Terrorist Threats, Section 422

Defendant contends the evidence is insufficient to support his conviction of terrorist threats (§ 422) with respect to Zook and Immer (counts 3 and 4), because (1) there is no substantial evidence he made a verbal, written, or electronic statement, as required by section 422 (see fn. 1, *ante*); (2) the throat-slashing gesture was not an unequivocal statement; and (3) the throat-slashing gesture was made under circumstances in which no immediate threat existed. We disagree.

### 1. Section 422 Requires a Verbal Statement, Not Mere Conduct

Section 422 (see fn. 1, *ante*) refers to a person who willfully threatens to commit a crime which will result in death or great bodily injury, with the specific intent that "the statement, made verbally, in writing, or by means of an electronic communication device," is to be taken as a threat.[7]

Defendant contends that section 422 requires a verbal, written or electronic "statement," and the only possibility in this case is a verbal statement. According to defendant, defendant's gestures, unaccompanied by verbal sound, do not qualify as verbal statements under section 422. We agree with defendant's view of the statute, but we find substantial evidence in the record that defendant made a verbal statement.

---

[7]Defendant notes the jury was given an outdated jury instruction omitting the words "made verbally, in writing, or by means of an electronic communication device." These words were added to section 422 in 1998. The offenses in this case occurred in 1999, as did the trial, but the jury was instructed with a version of CALJIC No. 9.94 predating the 1998 amendment. Nevertheless, defendant makes no assignment of instructional error and says the instruction given to the jury properly instructed that a "statement" must be found in order to convict.

We note the Legislative Counsel's Digest of the 1998 enactment stated in part: "Existing law prohibits the willful issuance of a threat to commit a crime which will result in the death or great bodily injury of another, with the specific intent that the statement be taken as a threat even if there is no actual intent of carrying out the crime, where the threat is so unequivocal, immediate, and specific so as to cause the recipient to reasonably be in sustained fear for his or her own safety or the safety of his or her immediate family. [¶] This bill would clarify that this provision applies to threatening statements made verbally, in writing, or by means of an electronic communication device, and would incorporate the definition of 'electronic communication' used in a specified provision of federal law. By expanding the scope of an existing crime, this bill would impose a state-mandated local program. . . ." (Legis. Counsel's Dig., Sen. Bill No. 1796 (1997-1998 Reg. Sess.) Stats. 1998, ch. 825, Summary Dig.)

■ We turn first to the meaning of the statute. " ' "Penal Code sections must generally be construed ' "according to the fair import of their terms, with a view to effect its objects and to promote justice." ' " [Citations.] [¶] "Consistent with that general principle, appellate courts first examine the language of the code section to determine whether the words used unequivocally express the Legislature's intent. If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citations.] [¶] When the language of the section is on its face ambiguous or leaves doubt, . . . , the court must resort to extrinsic aids to ascertain the purpose behind the statute and give the provision a judicially created meaning commensurate with the purpose. [Citation.]" [Citations].' " (*People v. Avila* (2000) 80 Cal.App.4th 791, 796 [95 Cal.Rptr.2d 651].)

■ The People argue nonverbal conduct may constitute a "statement" within the meaning of section 422. They cite a dictionary (a 1980 edition) definition of "verbal" as including a verbal symbol. Defendant's reply brief cites another dictionary (a 1974 edition) definition that "verbal" means consisting of or using words only and not involving action. We note a more current dictionary also includes as a definition of "verbal": "concerned merely with words, as distinguished from facts, ideas, or actions." (Webster's New World Dict. (3d college ed. 1988) p. 1482.)

In light of these differing dictionary definitions of "verbal," it is apparent the language of section 422 is ambiguous, and we shall turn to other aids of interpretation.

■ The first of these is that, " ' "It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' " (*In re Marriage of Corman* (1997) 59 Cal.App.4th 1492, 1499 [69 Cal.Rptr.2d 880], quoting *In re Jose A.* (1992) 5 Cal.App.4th 697, 701-702 [7 Cal.Rptr.2d 44].)

■ As noted by defendant, the Legislature knows how to make a statute applicable to nonverbal communication. Thus, the 1998 enactment that amended section 422 also amended stalking statutes that expressly define "threat" to include a verbal or written threat "or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct . . . ." (§ 646.9, subd. (g); Civ. Code, § 1708.7; Stats. 1998, ch. 825.) The omission of any reference to "conduct" in section 422 suggests the Legislature did not intend for communicative conduct to be penalized in that statute.

■ A second rule of statutory construction applicable to our interpretation of section 422 is that, " '[w]hen language which is susceptible of two constructions is used in a penal law, the policy of this state is to construe the statute as favorably to the defendant as its language and the circumstance of its application reasonably permit. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of a statute.' " (*People v. Snyder* (2000) 22 Cal.4th 304, 314 [92 Cal.Rptr.2d 734, 992 P.2d 1102], quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) For a doubt to be " 'reasonable' " it must be " 'realistic.' " (*People v. Rells* (2000) 22 Cal.4th 860, 869 [94 Cal.Rptr.2d 875, 996 P.2d 1184].)

■ Here, in light of the Legislature's express inclusion of "conduct" in the stalking statutes, and its omission from section 422, we have a doubt that is reasonable and realistic that the Legislature intended to include mere conduct within the ambit of section 422.

The People cite Evidence Code definitions. Thus, Evidence Code section 225 provides: " 'Statement' means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." Evidence Code section 250 provides: " 'Writing' means handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof."

However, even assuming for the sake of argument the Evidence Code definitions apply to the Penal Code at all (cf. Evid. Code, §§ 100, 300; *People v. Watkins* (1996) 45 Cal.App.4th 485, 489 [53 Cal.Rptr.2d 13]; *People v. Cooley* (1993) 14 Cal.App.4th 1394, 1398-1399, fn. 5 [18 Cal.Rptr.2d 346]), they do not support the People's position. Thus, while it is true that Evidence Code section 225 provides that a "statement" may mean nonverbal conduct, it is equally true that the Evidence Code applies, "[e]xcept as otherwise provided by statute . . . ." (Evid. Code, § 300; *People v. Watkins, supra,* 45 Cal.App.4th at p. 489.) Here, as pertinent, section 422 expressly provides that the "statement" must be "made verbally." The Penal Code definition controls. Indeed, because Evidence Code section 225 expressly refers to "nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression," the Evidence Code statute further demonstrates that the Legislature knows how to define nonverbal conduct, as a means of communication, when it wants to.

Nor were defendant's gestures "a writing" within the meaning of Evidence Code section 250. That section requires "recording upon any tangible thing." Defendant's gestures were not recorded "upon any tangible thing."

The People argue the gestures of finger to lips and throat slashing constituted a verbal or written statement as surely as sign language would. However, the People cite no authority applying section 422 to sign language. Moreover, "[l]iberality of interpretation cannot accomplish an end outside the terms of the statute, however desirable such a result might be. [Citation.]" (*Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 351 [231 Cal.Rptr. 690].)

Though not cited by the People, we note a concurring opinion in *People v. Mendoza* (1997) 59 Cal.App.4th 1333 [69 Cal.Rptr.2d 728], said "section 422 does *not* require the threat be literal or even verbal. Sending a government informant a dead, tongueless rat [which did not occur in the case before the court] may well violate section 422." (*Id.* at p. 1347, original italics.) However, *Mendoza* predates the 1998 amendment to section 422 (see fn. 1, *ante*), and in any event a concurring opinion is not precedential authority.

We conclude section 422 required in this case proof that defendant's threat to be quiet was "made verbally," i.e., that defendant orally made some noise or sound that was capable of conveying meaning.

 2. *The Record Contains Substantial Evidence That Defendant Made a Verbal Statement.*

We turn to the question whether substantial evidence supports defendant's conviction for violating section 422. The prosecutor argued to the jury that the section 422 offenses with respect to Zook and Immer occurred when Officer Jacobs was in the bedroom, with his back to the door, questioning Zook and Immer, and defendant appeared behind the officer.

Defendant argues the only substantial evidence concerning this incident was of conduct, not a statement, i.e., that defendant put his finger to his lips in a "shushing gesture" and slid his finger across his throat.

Thus, Zook testified at trial that defendant stood behind the officer, "did a gesture like this, like shush [witness demonstrated by placing his index finger in front of his lips]. And then ran his finger across his throat."

Immer testified at trial as follows:

"Q And was there some reason why you didn't say anything [to Officer Jacobs] with [defendant] in the bedroom [behind the officer]?

"A Yes.

"Q Why is that?

"A Because he swiped his hand across his throat.

"Q When you say he swiped his hand, could you show us what he did. (Witness demonstrating.)

"You're waving your hand across the throat. Did he do it several times?

"A Yes.

"Q Did he do anything else?

"A He told—said not to say anything.

"Q Did he actually say that?

"A After Officer Jacobs left.[8]

"Q What about while Officer Jacobs was there, did [defendant] say anything while Officer Jacobs was standing in front of you?

"A Yes.

"Q What did he say?

"A I'm not sure.

"Q Did he actually speak while Officer Jacobs was there?

"A He was speaking to Officer Jacobs.

"Q Was that before Officer Jacobs spoke to you?

"A No, it was after.

"Q After Officer Jacobs spoke to you?

"A Yes.

"Q Was that when Officer Jacobs was done talking to you?

---

[8]Officer Jacobs testified that after his contact with the minors, he told defendant to leave and escorted defendant out of the house and halfway down the street.

"A No."

On cross-examination, Immer testified:

"Q And what did [defendant] say to you after he did [the swiping motion across the throat]?

"A Not to say anything.

"Q And he said that by speaking; is that right?

"A He nodded his head and did that. (Witness demonstrating.)

"Q Did he say anything?

"A I don't recall.

"Q But he nodded his head and put his finger to his lips?

"A Yes.

"Q That was after the motion across the neck?

"A Yes."

Assuming that the foregoing testimony does not describe a verbal statement, that description is nonetheless found in the testimony of Officer Santos. Thus, Officer Santos, who contacted Zook and Immer in the street later in the evening, testified during cross-examination by defendant's counsel that the minors did report that defendant made a verbal noise. Thus, Officer Santos testified:

"Q . . . [D]id Mr. Immer tell you that [defendant] stated to them that they should not talk to the police?

"A He made a statement similar to that.

"Q Did you ask them [sic] to go into detail about that statement?

"A Yes. I wrote down the statement they told me.

"Q And what was the statement that [defendant] allegedly gave to tell these guys not to go to the police—to tell them not to go to [the] police?

"A If you would like the exact statement, I could refer to my report.

"Q Thank you.

"A If I have that page. Mr. Zook's statement was something about not talking to the police.

"Q He said [defendant] stated that to him?

"A [Defendant] made a statement generally about not talking to the police.

"Q [H]e made a statement. Did you take that to mean a verbal or oral statement?

"A He made a verbal statement and a physical gesture.

"Q He made a verbal statement. Did Mr. Zook show you the physical gesture?

"A Yes; he told me the gesture and the verbal statement together.

"Q And did Mr. Immer show you a verbal statement or did Mr. Immer show you a gesture?

"A Yes, he did."

Officer Santos further testified upon cross-examination by defendant's counsel:

"Q Okay. Just so we're clear by verbal statement does that mean he said anything?

"A The verbal statement was noise coming out. If you would like me to demonstrate?

"Q Sure.

"A What I understood was that shush and a swipe across the throat. I don't mean the actual say this or say that. I mean a noise that they made and it was interpreted to them don't talk to the police.

"Q So he said shush and he actually made the—

"A Some sort of noise, shushing noise. I believe one said he actually heard the noise and there was a finger to the mouth."

Thus, Officer Santos testified that at least one of the victims reported defendant made a verbal noise.

In this case, we do not have to decide whether section 422 requires that a defendant use a word in order to fulfill the requirement of a "statement made verbally." Even upon the assumption that the statute requires the use of a word, defendant cannot prevail. According to the testimony of Officer Santos, defendant uttered a sound that was either "shush" or "sh." Both "shush" and "sh" are defined as words by Webster's Third New International Dictionary (1961) pages 2108, 2082. Thus, "shush" means, "to urge quiet upon (as by making the sound 'sh' and holding an index finger before the lips) . . . ." Likewise, Webster's defines "sh" as, "often used in prolonged or reduplicated form to enjoin silence or urge moderation of sound." We therefore conclude that the "shush" or "sh" sound made by defendant constituted a "statement made verbally" for purposes of section 422.

Nor do we have to decide whether Santos's testimony constitutes substantial evidence on the ground that Santos testified to a prior inconsistent statement by Zook or Immer. (But see Evid. Code, § 1235; *People v. Chavez* (1980) 26 Cal.3d 334, 356 [161 Cal.Rptr. 762, 605 P.2d 401]; *People v. Green* (1971) 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998].) Santos's testimony was elicited by defendant without objection or motion to strike. ■ "Material and relevant evidence that is technically incompetent and inadmissible under the exclusionary rules, if offered and received without a proper objection or motion to strike, will be considered in support of the judgment." (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 393, p. 484.)

■ Consequently, the testimony of Officer Santos that at least one victim heard defendant make a "shushing" noise constitutes substantial evidence of a verbal "statement," the import of which was amplified by the throat-slashing gesture to constitute a threat to kill if the victim talked to the police. ■ "[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone." (*People v. Mendoza, supra,* 59 Cal.App.4th at p. 1340, followed in *People v. Butler* (2000) 85 Cal.App.4th 745, 754 [102 Cal.Rptr.2d 269].)

■ Defendant argues he "could not have made" a shushing sound or statement, because Officer Jacobs, who was standing between the defendant and the minors at the time in question, testified he did not hear any noise behind him and he would have heard if someone "snuck up behind him." However, the testimony of Officer Jacobs does not make it impossible for defendant to have made a sound.

■ Thus, in rejecting a defendant's argument that the evidence was insufficient because the victim's testimony was inherently improbable, *People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337], reiterated: " 'To be improbable on its face the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed.' . . . ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. . . . To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. . . . Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . ." ' " (*Id.* at p. 150, citations omitted.)

■ While it may have been foolish for defendant to make a shushing noise in the officer's presence, it was not impossible or inherently improbable for him to have done so.

Defendant argues the prosecutor in closing argument to the jury did not rely on a verbal statement. However, defendant cites no authority suggesting that a prosecutor must argue evidence to the jury in order for the evidence to constitute substantial evidence in support of a judgment. Moreover, even assuming for the sake of argument that that is the law, the record does not support defendant. The record shows the prosecutor argued to the jury: "They [Zook and Immer] are asked [by Officer Jacobs] about what happened. They say they won't say anything. They told you why. They saw [defendant] walk up behind Officer Jacobs. Saw [defendant] make a motion across his neck, *make a quite* [*sic*] sound or a quite [*sic*] motion. And then he leaves." (Italics added.)

Moreover, defense counsel in closing argument reminded the jury that Officer Jacobs testified he had 20 years experience as an officer and would know if somebody was sneaking up behind him, and "[h]e said no one snuck up on him. [¶] Officer Santos indicated he told you what the verbal statement or the verbal communication was, shush. Even more softly, more softly yet. Shush. I have to think Officer Jacobs would have heard that."

Thus, the question whether there was a statement "made verbally" was put in issue in closing arguments.

We conclude there was substantial evidence of a statement "made verbally" within the meaning of section 422.

### 3. *Unequivocal Statement*

■ Defendant argues the evidence was insufficient to convict him of terrorist threats because the throat-slashing gesture was not an "unequivocal statement" for section 422 purposes. We disagree.

Section 422 (see fn. 1, *ante*) requires that the threat "on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . ."

Defendant says the record was unclear which gesture defendant made first—the finger to the lips or the finger across the throat. Defendant proffers no rational explanation why this should make a difference. Defendant says a finger slashed across the throat also means "cut" or "quiet." Defendant claims the context in which the gesture was made did not clarify whether the gesture meant "quiet" or "quiet or I'll cut your throat." Defendant cites authority that wordless conduct is particularly susceptible to misconstruction. Defendant argues a gesture to be quiet, absent words to clarify the meaning of the gesture, may not form the basis for a section 422 conviction. However, we have seen there was evidence of a verbal statement.

In rejecting an argument that a threat was not unconditional as required by section 422, *People v. Bolin* (1988) 18 Cal.4th 297 [75 Cal.Rptr.2d 412, 956 P.2d 374], observed the statute did not require an absolutely unconditional threat, but that the threat be "so" unconditional as to convey gravity of purpose and immediate prospect of execution. (*Id.* at pp. 339-340.) *Bolin* said, " '[t]he use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*Id.* at p. 340.)

Here, defendant's shushing noise, accompanied by the throat-slashing gesture, was "so" unequivocal that it conveyed to Zook and Immer a sufficient gravity of purpose and immediate prospect of execution of the threat.

### 4. *Immediacy*

■ Defendant contends the throat-slashing gesture was made under circumstances in which there was no immediacy of the threat, as required by section 422. We disagree.

Section 422 (see fn. 1, *ante*) requires that the threat be "so . . . immediate . . . as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . ."

Defendant suggests there is no substantial evidence of immediacy because the police officer was present during the threat and thereafter escorted defendant away from the scene, and neither juvenile saw defendant again until prosecution of this matter. However, defendant fails to cite any evidence as to when the minors next saw defendant. In any event, at the time of the threat the minors did not know when they would next see defendant. The immediacy factor was present in the surrounding circumstances that defendant was in a rage. He had already hit Schmidt, punched Zook, and said he was going to kill Zook, as documented by the 911 call. Although the officer was present when defendant made the threat, the threat and surrounding circumstances were a reminder that the officer would not always be there to protect the minors.

Defendant argues there was insufficient evidence to support the terrorist threat conviction as to Immer, because there was evidence defendant looked at Zook when he made the threat, but there was no evidence defendant looked into Immer's eyes. We disagree. Zook and Immer were in close proximity; they were both sitting on the same bed. Obviously, defendant attempted to dissuade both witnesses. On appeal, defendant does not contend that separate acts must be present for the separate victims.

We conclude substantial evidence supports the section 422 convictions (counts 3 and 4).

### B. *Sufficiency of Evidence Re: Dissuading Witness*

Defendant argues the evidence is insufficient to support the conviction for dissuading a witness (Immer), because the evidence indicated defendant made the "be quiet" gesture only once, and he was looking at Zook when he did it, according to Zook's testimony. Therefore, defendant concludes, the gesture was directed solely at Zook. For reasons that we have recounted above, we disagree.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1426.

## V. Sentencing

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. Prior Prison Term Enhancement

 Defendant argues the one-year enhancement for a prior prison term under section 667.5, subdivision (b),[9] must be stricken, because the prosecution did not show the prior conviction, which was for a federal offense, included all the elements of a comparable California felony. Defendant also argues his trial attorney rendered ineffective assistance of counsel by failing to object on foundational and hearsay grounds to the evidence used to prove the enhancement. We shall conclude the enhancement finding must be reversed. We therefore need not decide whether trial counsel was ineffective.

 The People argue defendant waived his challenge to the enhancement by failing to present his objections to the trial court. We disagree. Defendant presents a matter of an unauthorized sentence which is not waived by failing to argue it to the trial court. (*People v. Scott*, (1994) 9 Cal.4th 331, 354-355 [36 Cal.Rptr.2d 627, 885 P.2d 1040].)

 Defendant's sentence was enhanced under section 667.5, subdivision (b), for a prior prison term resulting from a 1996 federal conviction under 18 United States Code section 472, for "possession of counterfeit United States currency with intent to defraud." The matter was submitted on certified copies of the federal court judgment (reflecting a guilty plea of 18 U.S.C. § 472, "POSSESSION OF COUNTERFEIT UNITED STATES CURRENCY WITH INTENT TO DEFRAUD") and other documents which did not reveal the facts underlying the prior conviction.

Section 667.5, subdivision (f), provides: "A prior conviction of a felony shall include a conviction in another jurisdiction for an offense which, if

---

*See footnote, *ante*, page 1426.

[9]Section 667.5 provides in part: "Enhancement of prison terms for new offenses because of prior prison terms shall be imposed as follows: [¶] . . . [¶] (b) Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence is imposed, in addition and consecutive to any other prison terms therefor, the court shall impose a one-year term for each prior separate prison term served for any felony; provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which the defendant remained free of both prison custody and the commission of an offense which results in a felony conviction."

committed in California, is punishable by imprisonment in the state prison if the defendant served one year or more in prison for the offense in the other jurisdiction. *A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law* if the defendant served one year or more in prison for the offense in the other jurisdiction." (Italics added.)

 The court may look to the entire record to determine the substance of a prior foreign conviction, but when the record does not disclose any of the facts of the offense actually committed, the court will presume the prior conviction was for the least offense punishable under the foreign law. (*In re Jones* (1994) 27 Cal.App.4th 1032, 1048 [33 Cal.Rptr.2d 469].)

 Here, as indicated, the trial of the prior prison term was submitted on a record that did not describe the particular circumstances of the federal offense. Thus, this appeal calls for an elements analysis.

The federal statute of which defendant was convicted (18 U.S.C. § 472) provides: "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than fifteen years, or both."

Defendant says the prosecution asserted in the trial court that the California equivalent to that offense was the forgery provision of section 475, subdivision (a).[10] Our review of the record, however, shows the prosecution argued in the trial court that forgery was the comparable California crime for purposes of using the federal offense *for impeachment purposes*. The trial court ruled the federal offense would be admissible for impeachment purposes if defendant chose to testify at trial. When it came to the court trial of the prior prison term enhancement, the prosecution presented no argument concerning the comparable California crime but simply submitted the matter on the federal documents. Thus, contrary to defendant's assertion on appeal, the prosecution did not orally invoke section 475 as the comparable California felony.

---

[10]Section 475 provides: "Every person who possesses or receives, with the intent to pass or facilitate the passage or utterance of any forged, altered, or counterfeit items, or completed items contained in subdivision (d) of Section 470 with intent to defraud, knowing the same to be forged, altered, or counterfeit, is guilty of forgery."

On appeal, the People do not rely on section 475 as the comparable California crime, nor do the People even mention section 475. Instead, the People on appeal assert the comparable California crime is section 480, subdivision (a), which provides in part: "Every person who . . . knowingly has in his . . . possession any . . . paper . . . made use of in counterfeiting . . . bank notes or bills, is punishable by imprisonment in the state prison . . . ."[11] The People maintain the federal crime of possession of counterfeit currency with intent to defraud includes all elements of section 480, subdivision (a).

The elements of the offense of possession of counterfeit currency, defined by 18 United States Code section 472 are:

1. That a person possessed counterfeit money;

2. That the person knew, at the time of possession, that the money was counterfeit;

3. That the possession was with intent to defraud. (See *United States v. Rodriguez* (9th Cir. 1985) 761 F.2d 1339, 1340.)

Before describing the elements of section 480, as pertinent to this case, we should mention two cases that interpret the language of section 480.

Thus, in *People v. White* (1867) 34 Cal. 183, our Supreme Court held that, in order to violate a predecessor statute to section 480 (Stats. 1850, ch. 99, § 78, p. 238), a person had to act with criminal intent. (34 Cal. at pp. 186-187.)

Next, *People v. Clark* (1992) 10 Cal.App.4th 1259 [13 Cal.Rptr.2d 209] held possession of a counterfeit bank bill does not constitute possession of a thing made use of in counterfeiting within the meaning of section 480. "[T]he Legislature has discerned separate harms and thus has separately treated the possession of completed counterfeit bills and the making or possessing of the means of counterfeiting." (10 Cal.App.4th at p. 1267.) *Clark* concluded possession of a counterfeit bill is violative of section 475, but not of section 480. (10 Cal.App.4th at p. 1267.)

Thus, with this judicial gloss in mind, the elements of the offense described by section 480 are as follows:

---

[11]"Bills" within the meaning of section 480 include Federal Reserve notes. (*People v. Ray* (1996) 42 Cal.App.4th 1718 [50 Cal.Rptr.2d 612].)

1. That a person knowingly possessed paper made use of in counterfeiting bank notes or bills but not consisting of the completed counterfeit bank notes or bills themselves;

2. That the possession was with criminal intent.

It is apparent that an element of the offense described by section 480 is the possession of paper not consisting of the counterfeit bank notes or bills themselves. This element of the offense is not included in the elements of the offense described by 18 United States Code section 472. Indeed, the federal offense requires a person to possess *completed* counterfeit bills or notes; i.e., counterfeit money. Since an element of the offense defined by section 480 is not found in the federal offense, the federal offense does not include "all of the elements of the particular felony as defined under California law" as required by section 667.5, subdivision (f).

Nor does section 475, subdivision (a), constitute a comparable California crime for purposes of section 667.5, subdivision (f). Indeed, as we have noted, the People do not contend otherwise. Section 475 provides: "Every person who possesses or receives, *with the intent to pass or facilitate the passage or utterance* of any forged, altered, or counterfeit items, or completed items contained in subdivision (d) of Section 470 with intent to defraud, knowing the same to be forged, altered, or counterfeit, is guilty of forgery." (Italics added.)

As defendant points out, the italicized intent required by section 475 is not an element of the federal offense, and therefore section 475 does not constitute a comparable California felony for purposes of section 667.5, subdivision (f).

The People mention sections 470, subdivision (d) and 476, but they do not present any argument that those sections support the enhancement. Instead, they merely assert: "It is submitted that possession of counterfeit currency with the intent to defraud encompasses all of the elements of section 480(a), if not sections 470(d) and 476."

In any event, neither section 470, subdivision (d) nor section 476 will support the enhancement.

As pertinent, section 470, subdivision (d) provides: "Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine,

any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: any . . . bank bill . . . ."

Section 470, subdivision (d) requires an affirmative act of making, altering, forging, counterfeiting, uttering, publishing, passing, or attempting or offering to pass a false bank bill.[12] As we have explained, the federal crime of which defendant was convicted requires none of these affirmative acts, but rather requires mere possession of counterfeit money. Because section 470, subdivision (d) contains elements not found in the federal offense, it will not support an enhancement under section 667.5, subdivision (f).

Section 476 provides: "Every person who makes, passes, utters, or publishes, with intent to defraud any other person, or who, with the like intent, attempts to pass, utter, or publish, or who has in his or her possession, with like intent to utter, pass, or publish, any fictitious or altered bill, note, or check, purporting to be the bill, note, or check, or other instrument in writing for the payment of money or property of any real or fictitious financial institution as defined in Section 186.9 is guilty of forgery."

Section 476 requires that the mere possession of a fictitious or altered bill be with the specific intent "to utter, pass, or publish" the bill. This specific intent is not found in the federal offense of which defendant was convicted. Because section 476 requires an element not included in the federal offense, it will not support an enhancement under section 667.5, subdivision (f).

We have not been cited, nor have we found a comparable California felony that will support an enhancement, under the requirements of section 667.5, subdivision (f), for defendant's prior federal conviction for possession of counterfeit United States currency. Accordingly, we conclude the trial court erroneously found the section 667.5 enhancement to be true, and the enhancement must be stricken. We therefore need not address defendant's further argument that his trial counsel rendered ineffective assistance of counsel by failing to raise in the trial court evidentiary objections to the evidence submitted by the prosecution.

 The People ask that we remand the case to the trial court for retrial of the enhancement in the event we conclude the prosecution's showing was deficient. Defendant in turn argues we should bar retrial "for the reasons set

---

[12]To "utter" a forged instrument is to "make use of" the instrument. (*People v. McKenna* (1938) 11 Cal.2d 327, 332 [79 P.2d 1065].) As used in the forgery statutes, "utter" means, " 'to put in circulation, as money or currency; to cause to pass in trade.' " (*People v. Descant* (1942) 51 Cal.App.2d 343, 348 [124 P.2d 864].)

forth in *People v. Mitchell* (2000) 81 Cal.App.4th 132 [96 Cal.Rptr.2d 401] and the Due Process Clause of the federal Constitution. (*People v. Coley* (1997) 52 Cal.App.4th 964, 969 [60 Cal.Rptr.2d 870] [reversal for insufficiency of the evidence bars retrial].)" We shall remand to the trial court for retrial.

Our Supreme Court has held that, where a prior conviction finding is reversed on appeal for a lack of substantial evidence, the proper procedure is to remand the case to the trial court for a retrial of the prior conviction allegation. (*People v. Morton* (1953) 41 Cal.2d 536, 543-545 [261 P.2d 523].)

Such a retrial of a prior conviction allegation does not offend federal or state prohibitions on subjecting a defendant to double jeopardy. (*Monge v. California* (1998) 524 U.S. 721 [118 S.Ct. 2246, 141 L.Ed.2d 615]; *People v. Monge* (1997) 16 Cal.4th 826, 845 [66 Cal.Rptr.2d 853, 941 P.2d 1121].)

Defendant relies on *People v. Mitchell, supra,* 81 Cal.App.4th 132, where Division One of the Fourth District held such a retrial of a prior conviction allegation was barred by principles of res judicata and law of the case.

However, in *People v. Scott* (2000) 85 Cal.App.4th 905, 918-926 [102 Cal.Rptr.2d 622], Division Three of the Second District concluded *Mitchell* was wrongly decided. On April 11, 2001, our Supreme Court denied review in *Scott.* In *Cherry v. Superior Court* (2001) 86 Cal.App.4th 1296, 1303 [104 Cal.Rptr.2d 131], Division Four of the Second District recently followed *Scott* and declined to follow *Mitchell.* On May 2, 2001, our Supreme Court denied review in *Cherry.*

We need not repeat *Scott*'s lengthy analysis here. Suffice it to say that we agree with it, and we respectfully decline to follow *Mitchell.*

We also agree with the following analysis of the doctrine of law of the case as articulated in *Scott*:

"Appellant also contends that our determination that the evidence was not sufficient to prove the alleged prior serious felony conviction will become the law of the case upon remand and thereby prevent the trial court from reaching a contrary conclusion. We disagree.

"The answer to this argument is clearly and easily settled by the express language of the Supreme Court in *Monge.* After concluding that neither state

nor federal double jeopardy principles would bar a retrial of a prior conviction allegation, the court went on to note that secondary issues might well be raised. 'For example, the Court of Appeal's determination that the evidence was insufficient to prove defendant's prior conviction was of a serious felony is, at the very least, the law of this case. Thus, the prosecution would have to present additional evidence at a retrial of the prior conviction allegation in order to obtain a different result. What limitations might apply to this additional evidence (other than the limitations we identified in *People v. Reed* [(1996)] 13 Cal.4th 217 [52 Cal.Rptr.2d 106, 914 P.2d 184], and [*People v.*] *Guerrero* [(1988)] 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150]) we do not decide, because the Court of Appeal did not address that issue.' ([*People v.*] *Monge, supra,* 16 Cal.4th at p. 845.)

"Although dicta, this language is dispositive of the issue before us. To the extent that the People attempt on remand to prove the prior conviction allegation using only the evidence presented at the first trial, then the law of the case will compel the same result (i.e., the evidence is insufficient). However, the doctrine cannot be used to *prevent* the retrial. It merely means that, in order to succeed, the People will have to produce *additional* evidence at such retrial. Although the *Mitchell III* court asserts that such additional evidence must be 'newly discovered evidence which [the People] in due diligence, could not have presented at the first trial,' it cites no authority for such a requirement. *Mitchell III* relies partially on *Monge* for that principle, but *Monge* expressly requires only that there be '*additional* evidence.'" (*People v. Scott, supra,* 85 Cal.App.4th at p. 924.)

Defendant also relies upon our opinion in *People v. Coley, supra,* 52 Cal.App.4th 964, 969, where we mentioned the general rule that, in a criminal case, a finding of insufficiency of the evidence by the court of appeal bars a retrial. However, *Coley* did not involve the retrial of a prior conviction allegation. The principles governing retrials of prior convictions are set out in the federal and state *Monge* cases, which do not bar retrials of prior convictions even where an appellate court finds a lack of substantial evidence. (*Monge v. California, supra,* 524 U.S. 721 [118 S.Ct. 2246, 141 L.Ed.2d 615]; *People v. Monge, supra,* 16 Cal.4th 826.)

We therefore conclude defendant's arguments are without merit; we shall remand to the trial court for a retrial of the prior prison term enhancement.

DISPOSITION

The trial court's finding that the section 667.5, subdivision (b) enhancement was true is reversed, and the cause is remanded to the trial court for a

retrial of the enhancement in accordance with the views set forth in this opinion. The abstract of judgment is ordered modified to stay the sentences on the section 422 counts (counts 3 and 4) and to strike the prior prison term enhancement. The judgment is otherwise affirmed.

Davis, J., and Morrison, J., concurred.

A petition for a rehearing was denied May 24, 2001, and appellant's petition for review by the Supreme Court was denied August 22, 2001.