Filed 5/22/13  P. v. Ramos CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B238093 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA 386321) |
| v. | |
| MARIO RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Sonya Roth, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

A jury convicted appellant Mario Ramos of stalking and making criminal threats. Appellant contends (1) the evidence was insufficient to support his conviction for criminal threats, and (2) the court prejudicially erred in failing to instruct the jury on the lesser included offense of attempted criminal threats. We affirm.

## STATEMENT OF FACTS

Susana A. met appellant in Mexico, where they began dating. They were together for approximately 10 years and had one son together. They left Mexico in 2001 and moved to Washington for a short time. In November 2001, they moved to Los Angeles. Approximately two months later, Susana became pregnant. Their son was born in Los Angeles. Some time later the couple moved to Idaho where appellant had family. Appellant had an accident in Idaho and stopped working. Susana was working to support the family. Around this time appellant started insinuating that he believed Susana was being unfaithful to him, and he became violent with her. He pulled her hair several times and hit her one time.

The couple eventually moved back to Los Angeles, approximately four years before appellant's trial in this matter. They had money problems and continued to have arguments that would become violent. He would also say insulting things to her, like calling her a "whore" or saying she was "whoring around." In April 2011, Susana decided to leave appellant. The last week before she left him, he was making insulting remarks to her every day. She would lock herself in the bathroom to get away from him, but he would continue to say things to her. The night before she left him, she was in the bathroom for three hours waiting for him to leave the house. When he finally left, she called her aunt to pick her up. Susana went to live with her aunt and uncle, Emiliana and Ignacio G.

The first month after Susana left appellant, he called almost every day pleading with her to come back to him. Susana at first would tell him no, and eventually she stopped answering his calls. He began leaving her voicemail messages calling her a "whore" and saying "many ugly, vulgar things." He also started to threaten physical harm. He told her, "I'm going to look for you. I'm going to kill you. If you don't

2

answer me, things are going to get worse for you." She had five or 10 such messages in April 2011. She had many messages in which he said he was going to find her and kill her or "cut [her] up in little pieces."

In May, she received a text message from appellant that said, "I'm going to find you. No matter where you hide, I'm going to find you." He also sent another one saying, "I'm going to kill you, and I'm going to cut you up in little pieces. I'm going to put you in the refrigerator, and I'm going to eat you up little by little." He sent her a photograph via text message showing him with a gun sitting on his legs. Beneath the photograph, the message said, "Don't you believe me? Look." He sent around five text messages in June. One of them said, "Don't answer, and whenever I see you, I will kill you. You know that I don't lie. I'm really crazy. I'm going to kill you. That is for sure. You and the others down there. And all this because you don't answer." In another message, he said, "I'm going to take you out tonight. Don't fall asleep. You know me, and you know this is true. I'm going to make you suffer." He also sent a message saying, "You know I'm going to kill you. I'm going to do it, because you are not going to make a fool out of me. You know very well that I will do it." Around this time, Susana would see appellant outside her house, as if he was spying on her. When Susana had to leave the house, she felt "bad" and "fearful" because she would always see appellant following her, and she did not want to go out alone. She saved appellant's text messages and showed them to Emiliana and Ignacio. When Ignacio saw them, he thought appellant was "crazy" and was going to kill Susana. He became concerned for his and his family's safety.

On a day in May, Ignacio and Susana were dropping off Susana's son at school, and appellant was there. Appellant tried to hit Susana, and Ignacio got out of the car. Appellant told Ignacio he was going to "beat the s--t out of" him and that he was going to "bump [him] off." Ignacio understood "bump off" to mean appellant was going to kill him. Appellant went off laughing. Approximately two days later, appellant left Ignacio a voicemail message saying appellant wanted to speak with him, and he did not want Ignacio's children to be left without a father. When Ignacio heard that message, he felt

3

"badly" because he started thinking of his children and family. He thought appellant wanted to kill him.

On or around June 15, 2011, appellant confronted Susana after she dropped off her son at school. He stopped her on the sidewalk as she was walking with a friend. She agreed to talk with him because she knew he would try to stop her from walking off otherwise. He told her to sit down, but she refused. He grabbed her by the neck with both hands and squeezed hard, and said, "What do you want?" She broke free and ran away. As she was running away, she heard him say, "I'm going to kill you," and "Keep on running. It doesn't matter. I'm going to find you, anyway." In June, Ignacio received some text messages from appellant that told him "[n]ot to get involved anymore." Appellant also told Ignacio again that he was going to "bump" him off. Ignacio reported to the police that appellant was threatening him. He told the police he feared for his and his family's safety. He also took Susana to the police station to report the incidents against her. Ignacio received a total of two threatening text messages and two threatening voicemails from appellant.

On July 7, 2011, appellant came to Emiliana and Ignacio's house and yelled for Susana to come out. She went out to see what he wanted. They walked down the street away from the house and argued. She asked what he wanted and said she already told him there was no chance of reconciliation. He said his fight was with Ignacio, not her. She told him to hit her if he wanted to and then "leave [her] in peace already." As they continued walking, appellant grabbed her by the hair and on the arm and punched her in the head. He pulled her into a parking lot and punched her three or four times in the head. Susana walked away and ran into a store. She waited in the store for a short while and then left and began walking home. Appellant waited for her outside the store and followed her home. At the door of the house, he caught up with her and hit her once or twice.

Ignacio and Emiliana were in the car in the driveway of the house when this happened. Ignacio saw Susana running from appellant and crying. He saw appellant hit her five or six times. He got out of the car and argued with appellant. Appellant told

4

Ignacio he wanted to hit him, and if Ignacio "was a man," he would fight appellant. Ignacio responded, "Well, if you want to [hit me], well, do it." Emiliana got a broom and began hitting appellant with it. Susana would not allow Ignacio to get into a fight with appellant. Police officers arrived and arrested appellant. They found appellant walking quickly down the street from Susana's house. The officers saw Ignacio walking approximately 20 feet behind appellant. Ignacio pointed to appellant when he saw the officers. As they arrested appellant, he told Ignacio, "Even if five or ten years go by, I'll come out and kill you." Ignacio felt "badly" and afraid when appellant said this. Ignacio walked back to Susana with Officer Kathleen Talbot after the officers arrested appellant. Officer Talbot then interviewed Susana and Ignacio. The officer thought Ignacio appeared calm during the interview.

## PROCEDURAL HISTORY

The second amended information charged appellant with one count of stalking Susana and two counts of making criminal threats to Ignacio. Regarding the two counts of criminal threats to Ignacio, the information charged that the first instance occurred on or between May 20, 2011, and June 27, 2011. It charged the second instance occurred on or about July 7, 2011. During closing argument, the prosecutor argued that the first charged threat occurred when appellant left Ignacio a voicemail in May saying that he did not want Ignacio's children to be left without a father. The prosecutor argued that the second charged threat occurred when the officers arrested appellant on July 7, and he told Ignacio that he was going to kill him "[e]ven if five or ten years go by."

The jury found appellant guilty as charged on all three counts. The court sentenced appellant to a total of three years four months in state prison. Appellant filed a timely notice of appeal.

## STANDARD OF REVIEW

When a criminal defendant claims on appeal that his conviction was based on insufficient evidence, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact

5

could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Moreover, reversal on the ground of insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

We apply "the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

**DISCUSSION**

*1. Substantial Evidence Supported Appellant's Conviction for Criminal Threats*

The prosecution must establish the following elements to convict a defendant of making criminal threats under Penal Code section 422:[1] "'(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat -- which may be "made verbally, in writing, or by means of an electronic communication device" -- was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and

---

[1]    Further undesignated statutory references are to the Penal Code.

(5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 630.)

Appellant contends that the evidence relating to both criminal threat counts was insufficient to show Ignacio was actually and reasonably in sustained fear of death or great bodily injury. We disagree.

A "sustained fear" is one "that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) The threat must be examined in light of the surrounding circumstances. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 340.) "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*People v. Allen*, at p. 1156.) As to the voicemail threat, appellant argues that Ignacio confronted appellant on July 7, which was after Ignacio received the voicemail; appellant urges this was not the mindset of someone in sustained fear. We are not persuaded by this argument. Ignacio received the voicemail from appellant in May 2011. The fact that Ignacio tried to defend Susana weeks later in July 2011 does not prove he was not in sustained fear of appellant in May. The term does not mean that the victim must sustain his or her fear for weeks at a time. It merely means something more than momentary, as explained above.

Appellant further argues that Ignacio never testified appellant's voicemail left him in sustained fear. But there is no talismanic requirement that Ignacio have uttered the phrase "sustained fear" in describing his state of mind. As long as the evidence supported a reasonable inference that appellant's actions created a sustained fear in Ignacio, the jury properly convicted appellant. There was such evidence here. Only two days before receiving the voicemail, Ignacio witnessed appellant try to hit Susana when they were dropping her son off at school; when Ignacio tried to intervene on that occasion, appellant told him he was going to beat him and "bump" him off. Before the school incident, Susana had showed Ignacio the text messages from appellant stating he was going to cut her into pieces or kill her. Ignacio was already concerned for his and his family's safety after seeing those messages. And when Ignacio heard appellant's message saying that he did not want Ignacio's children to be left without a father, Ignacio

7

testified he thought appellant wanted to kill him. He said the message made him feel "badly," and he started thinking of his family. In light of appellant's conduct leading up to the voicemail message, and Ignacio's testimony regarding his thoughts and feelings upon hearing the message, substantial evidence supported the jury's inference that Ignacio's fear was more than momentary, fleeting, or transitory.

As to the July 7 threat when the officers were arresting him, appellant urges that any fear was unreasonable because he had no immediate ability to execute the threat in police custody. We also find this argument unpersuasive. The defendant's intent that the statement be taken as a threat, not his or her intent to actually carry out the threat, is dispositive. (*In re George T.*, *supra*, 33 Cal.4th at p. 630.) Moreover, section 422 "does not require an immediate ability to carry out the threat." (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679; see also *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [Section 422 "requires only that the words used be of an immediately threatening nature and convey 'an immediate *prospect* of execution' (italics added) even though the threatener may have no intent actually to engage in the threatened conduct. . . . It does not require the showing of an immediate ability to carry out the stated threat"].) Even when defendants are incarcerated or being arrested as they make threats, courts have found victims' fear to be reasonable based on surrounding circumstances, such as the defendant's prior conduct. (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431-1432 [even though defendant was in jail and could not carry out threats to former girlfriend immediately, she reasonably believed he would be released and carry out threats, based on defendant's history of assaulting her]; *People v. Franz* (2001) 88 Cal.App.4th 1426, 1449 [although defendant made threat while being arrested, immediacy factor was present in surrounding circumstances; defendant "in a rage," had already assaulted victims, and had already threatened one victim].) Ignacio knew of appellant's prior threats to kill Susana, had seen appellant attempt to hit her, and had received threatening voicemails and texts from appellant, which concerned Ignacio enough to file a police report. That day the officers arrested appellant, Ignacio saw appellant actually hit Susana multiple times. The evidence demonstrated that appellant was certainly willing to

8

commit violence against Ignacio, and any fear of such was reasonable, regardless of appellant's ability to carry out violence at the moment he uttered the threat. Further, Ignacio felt badly and afraid when he heard appellant's threat. Substantial evidence supported the judgment.

## 2. *The Court Did Not Err in Failing to Instruct the Jury on Attempted Criminal Threat*

We also reject appellant's second contention that the court erred in failing to instruct the jury on the lesser included offense of attempted criminal threat. "'"[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present."' [Citation.] Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' [Citation.] '"Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive."'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

Attempted criminal threat is a lesser included offense of criminal threat. (*People v. Toledo* (2001) 26 Cal.4th 221, 226.) A defendant may be convicted for attempted criminal threat when "acting with the requisite intent, [the defendant] makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear . . . ." (*People v. Toledo, supra*, 26 Cal.4th at p. 231.) Appellant argues that, because there was evidence Ignacio was not actually in sustained fear of him, the appropriate charge was attempted criminal threat, not criminal threat.

We are not convinced there was substantial evidence supporting such a theory. Ignacio testified that appellant's threats made him feel badly and he was concerned for his and his family's safety when he heard appellant's threats. He told the police when he filed a report that he feared for his and his family's safety. Appellant's evidence that Ignacio was not actually in fear is that (1) he was willing to fight appellant weeks after he

9

received the threatening voicemail, and (2) he appeared calm when Officer Talbot interviewed him and Susana after appellant's arrest. In light of all the other evidence supporting appellant's conviction, this was *not* substantial evidence from which a jury composed of reasonable persons could conclude appellant committed the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court had no duty to instruct on the lesser offense.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.