Filed 6/18/13  P. v. Turnage CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>BARRY ALLEN TURNAGE,<br><br>　　　　Defendant and Appellant. | C059887<br><br>(Super. Ct. Nos. 065019,<br>041665)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>REHEARING<br><br>[NO CHANGE IN<br>JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 22, 2013, be modified as follows:

Part III, beginning on page 13 and ending on page 15, is deleted in its entirety and the following part III is inserted in its place:

### III

**Sufficiency of "Strike" Evidence**

Defendant argues in his opening brief that there is not sufficient evidence to prove a 1985 prior "strike" conviction because in 1978 he was

found not guilty by reason of insanity (NGI). In their initial response, the People denied defendant was found NGI, insisting that defendant misread the documents supporting his claim. According to the People, the documents established that criminal proceedings were suspended and later reinstituted, and references to defendant's being found "not guilty—insane" were clerical errors.

It is fair to say that the evidence in the record regarding the NGI finding is confusing. There is documentary evidence indicating that in May 1978 charges of battery and assault with a deadly weapon on a peace officer or firefighter against defendant were resolved by an NGI finding and he was committed to Napa State Hospital. (§ 1026.) However, there is a document, relied on by the People, that indicates the court suspended the criminal proceedings on a finding of defendant's then present incompetence to stand trial (§ 1367 et seq.), although entries in defendant's summary criminal history from the Department of Justice contradict this document. The summary shows a series of arrests and convictions in 1981 before a commitment to Atascadero State Hospital (Atascadero) on October 29, 1982, pursuant to section 1026 (which is not a disposition ordered in any of the 1981 incidents), and the People do not explain how defendant would have been at liberty in 1981 if the criminal proceedings had merely been suspended in 1978 until he regained competence to stand trial.

Moreover, on March 28, 1985 (the date listed on the summary criminal history for his discharge from Atascadero), there was a hearing at which the People "concede(d) a Petition for Writ of Habeas Corpus," pursuant to which the court allowed defendant "to withdraw his plea of [NGI]" and enter pleas of guilty to a violation of section 245 with a firearm use allegation and to a violation of section 243 in exchange for the court's sentencing him to time already served. Recognizing the confusion in the record, the People argued in the alternative that "if this Court concludes that the prior-conviction record is ambiguous, or even if this Court finds the evidence insufficient to support the prior conviction, the matter may be retried."

Following remand, at defendant's request, we took judicial notice of a 1985 nonpublished opinion of the First District Court of Appeal in which defendant's commitment to Napa State Hospital after being found NGI is noted. We directed the parties to file letter briefs discussing the significance of the opinion. In response, the People asked that we also take judicial notice of various documents establishing that on May 3, 1978, defendant was found not guilty of the underlying charge by reason of insanity, but was

2

permitted to withdraw his NGI plea on March 28, 1985, and enter a plea of guilty.  The People's request is granted.

Notwithstanding their earlier insistence that defendant's criminal history records did not establish a prior NGI finding, and though they urged this court to remand the matter for retrial if we found the prior-conviction record ambiguous, the People now insist the record is clear:  defendant was found NGI but was later permitted to withdraw his NGI plea and enter a plea of guilty to the disputed prior.  The People argue that, "[f]or the sake of judicial economy," we should simply accept their change of position on the NGI issue while rejecting defendant's legal argument that the court was without jurisdiction to accept the change of plea, and conclude the 1985 guilty plea was valid.  It is tempting to avoid the inconvenience of a remand by resolving as a matter of law facts that were previously hotly disputed, deciding a legal issue that until now had not been addressed by the People, and concluding the evidence is sufficient to prove a prior strike conviction. We decline to do so.

The better course of action is to reverse the prior-conviction finding and remand the case to the trial court for a retrial of the prior-conviction allegation.  (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1455.)  The trial court can determine the disputed issues after considering the additional evidence proffered by the People and the conflicting arguments offered by both sides as to the legal effect of such evidence.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

BY THE COURT:


          RAYE          , P.J.


          BUTZ          , J.


          MURRAY          , J.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

<table>
<tr><td>THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>BARRY ALLEN TURNAGE,<br><br>       Defendant and Appellant.</td><td>C059887<br><br>(Super. Ct. Nos. 065019,<br>041665)</td></tr>
</table>

**INTRODUCTION**

A jury convicted defendant Barry Allen Turnage of maliciously placing a false or facsimile bomb in 2006 with the intent to cause others to fear for their safety (Pen. Code, § 148.1, subd. (d)),[1] found he was legally sane at the time of the commission of the offense, and found he had two prior convictions that came within the meaning of section 667, subdivision (d).  Based on the evidence it heard at trial regarding the present

---

[1]  All further statutory references are to the Penal Code.

offense, the trial court found that defendant violated his probation in a 2004 drug case, in which there was a suspended imposition of sentence. The court sentenced defendant to state prison for the upper term on the 2004 offense, with a consecutive indeterminate prison term of 25 years to life for the present offense. (§ 667, subd. (e)(2)(A)(ii).)

Defendant appealed, contending: 1) his felony sentence for placing a false bomb violated his constitutional right to equal protection, because placing a false weapon of mass destruction under similar circumstances (without causing "sustained fear") is only a misdemeanor (§§ 11418.1, 11418.5, subd. (b)), and to due process, because "false or facsimile bomb" is too vague a term; 2) the trial court should have granted his motion for acquittal (§ 1118.1) because there was insufficient evidence of a false bomb, or of his intent to cause others to fear for their safety; 3) there was insufficient evidence to support the recidivist finding based on his 1985 entry of a guilty plea, because the 1985 court did not have jurisdiction to accept a withdrawal of his 1978 plea of not guilty by reason of insanity (NGI) to the charge; and 4) that if we reversed his present conviction we must reverse the court's finding that he violated probation and remand for further proceedings in the 2004 case.

In our initial opinion, we agreed with defendant's equal protection claim that there was no rational basis for distinguishing the two crimes and concluded that a violation of section 148.1, subdivision (d) (hereafter § 148.1(d)) would be punishable only as a misdemeanor. This conclusion mooted his claim regarding the recidivist finding. We rejected his remaining arguments.

The California Supreme Court granted review. The court affirmed our judgment "insofar as it upheld the trial court's finding of a probation violation and declined to reverse, in its entirety, defendant's conviction under Penal Code section 148.1, subdivision (d)" but otherwise reversed and remanded "for proceedings not inconsistent with the views expressed herein." (*People v. Turnage* (2012) 55 Cal.4th 62, 81 (*Turnage*).) On remand, we vacate defendant's sentence, reverse the true finding as to

2

the allegation that defendant suffered a 1985 conviction for assault with a deadly weapon and remand the matter for a retrial as to that allegation, and in all other respects affirm the judgment.

## FACTUAL BACKGROUND

We set forth the relevant facts from our prior opinion.

The Yolo County Communications Center (YCCC) in Woodland is the 24-hour dispatch headquarters for the county's police, fire, and ambulance services. It is located in the middle of a parking lot, surrounded by other buildings. In order to enter the parking lot, a driver must stop at a key pad that activates a gate.

In September 2006 a YCCC dispatcher was returning from a coffee run on a Sunday morning. As she approached the road leading to the gate, she noticed a maroon Ford Thunderbird that was backing up. She testified that she remembered the car clearly because it was similar to the car of a dispatcher who had recently left the job. However, her suspicions were aroused when the driver leaned over toward the passenger side in a maneuver that looked uncomfortable and struck her as unusual, as if he were trying to conceal his face.

As the dispatcher passed the Thunderbird and approached the key pad, she saw a box underneath it with a flag sticking out of its top and "C-4" written on the side facing her.[2] This had not been there when she left 15-20 minutes earlier. She was scared, because she knew C-4 was an explosive and thought that this might be a bomb, even though it did not have any external indications of a fuse. She parked in her spot on the other side of the building. When she entered the YCCC, she announced to the others in the room that there was a bomb threat, and she placed a telephone call to the police instead of using the radio because the latter could trigger some types of bombs. The

---

[2] Although the writing is not legible, we have included a photograph of the box as an appendix to this opinion; the bomb itself was an exhibit at trial.

employees waited inside for the police to arrive, which took about 15 minutes. By this time, her shift had ended and she walked outside to meet the police. No one else left the building, and as far as the dispatcher could recall the YCCC operations were not interrupted.

A police officer who heard the bomb report saw a maroon Thunderbird parked in front of a nearby coffee shop. Through the coffee shop window, the officer saw defendant, who matched the general description of the driver of the Thunderbird. He was drawing on some newspapers. The officer entered the coffee shop and asked defendant if he could speak with him outside. Defendant responded calmly in an amenable manner, and he and the officer left the shop. Defendant volunteered that he had come from the sheriff's department (actually the YCCC), where he had left a box on which he had written C-4, which he knew was a plastic explosive. He claimed this was a joke, not meant for anyone in particular and not intended to cause anyone harm. However, he mentioned that he knew there were women at the YCCC who had made fun of him, which upset him. He would not be any more specific about these women. He said the box contained only a plastic bag filled with bleach and motor oil.

Another responding officer had seen defendant about 25 minutes before the bomb report at a four-way stop near the YCCC. Defendant had stared at the officer for an extended period of time, looking agitated or angry.

Among defendant's effects at the coffee shop was a disposable camera. He said he photographed various government buildings, bridges, and police officers. There were random writings on the newspaper and on a Watchtower pamphlet; the phrase "Angry 19" was written next to or on a drawing of a box with an antenna, and there were drawings of what appeared to be radio towers. There were also books on the supernatural and parapsychology.

In a search of defendant's apartment, which was directly north of the complex of county buildings, the police found a number of photographs. They also found

photographs in the trunk of his car. These were mostly innocuous, but included pictures of the parking area for the district attorney, patrol cars, a university police station, the courthouse, the headquarters of the probation department, and the offices of the county's Department of Mental Health. They did not find any explosives or detonators. They also did not find any manifestos or other angry writings.

A few days before defendant placed the fake bomb, a worker in one of the buildings around the YCCC saw him near his car, which was parked across from the Health and Social Services building. He was pacing back and forth, and making gestures that looked like he was pretending to shoot a rifle at the building. He was someone she had seen around the premises about a dozen times in the nine-month period she had worked there. His actions frightened her. She reported this to the police.

A bomb expert testified that actual bombs frequently do not appear to be bombs. C-4 is an explosive of high strength. The small size of the box did not diminish the possible power of the bomb. The flag could have been an antenna. Only after X-raying the box and not seeing any solid materials or power sources did he feel comfortable about opening it. Only then was he able to confirm that it did not contain an explosive or a detonator.

## DISCUSSION

### I

A.    **Equal Protection**

As pointed out by the Supreme Court, the Legislature long ago penalized conduct involving destructive devices and other weapons of a highly dangerous and explosive nature. (*Turnage*, *supra*, 55 Cal.4th at p. 71.) Bombs are commonly understood to be so " 'inherently dangerous' " to intended and unintended victims alike that "possession can be unlawful 'even when [the device is] *not* set to explode.' " (*Ibid*.) Because of these known dangers, section 148.1 has long prohibited various acts that exploit the public's fear of bombs, and that predictably provoke havoc and alarm. Section 148.1 punishes

5

knowingly false reports of bombs to peace officers or other people as a "wobbler" with imprisonment in state prison or up to a year in jail. (§ 148.1, subds. (a)-(c).) Section 148.1(d), at issue in the present case, has for over 40 years prohibited the handling of false bombs and imposed criminal penalties for violations. At the time of defendant's crime it punished as either a felony or misdemeanor "[a]ny person who maliciously gives, mails, sends, or causes to be sent any false or facsimile bomb to another person, or places, causes to be placed, or maliciously possesses any false or facsimile bomb, with the intent to cause another to fear for his or her personal safety or the safety of others . . . ." (Former § 148.1(d), added as subd. (c) by Stats. 1972, ch. 1142, § 1, p. 2210, redesignated as subd. (d) by Stats. 1984, ch. 824, § 1, and as amended by Stats. 1991, ch. 503, § 1, p. 2446.)

In 1999, concerned with the increasing threat of terrorism that made use of chemical, biological, nuclear, or radiological agents (§ 11416), often with dispersal methods that included explosive devices (§ 11417, subd. (a)), the Legislature enacted another legislative scheme that targets "weapons of mass destruction" (WMD) (§ 11416; see § 11415 et seq. [Hertzberg-Alarcon California Prevention of Terrorism Act], added by Stats. 1999, ch. 563, § 1, p. 3936) and created a new offense of producing, possessing, or using WMDs (§ 11418). In 2002 the Legislature added section 11418.1 to penalize any person who places, sends, or possesses "any false or facsimile of a [WMD], with the intent to cause [others] to fear for [their] own safety, or for the . . . safety of others," punishable only as a misdemeanor except where this "causes another person to be placed in sustained fear" (in which case the conduct is punishable as either a felony or misdemeanor).[3]

_____

[3] Among the nonexclusive examples in the cross-referenced definition of sustained fear are evacuations of buildings or isolation, quarantine, or decontamination efforts. (§ 11418.5, subd. (b).)

Thus, a violation of both section 148.1(d) and section 11418.1 occurs when the perpetrator commits the proscribed act, e.g., "places" a "false or facsimile" bomb or WMD "with the intent to cause" another person "to fear" for his safety or the safety of others. (§§ 148.1(d), 11418.1.) However, while the false bomb statute permits felony or misdemeanor punishment, the false WMD statute defines the crime as a misdemeanor and provides the option of felony treatment only if the perpetrator's intentional effort to instill fear ultimately "causes another person to be placed in sustained fear." (§ 11418.1.) Defendant argues that persons convicted under section 148.1(d) and those convicted under section 11418.1 have both placed, sent, or possessed a false object with the intent to cause fear (but without causing sustained fear); the only distinction is the type of object—a false or facsimile bomb under section 148.1, or a false or facsimile WMD under section 11418.1.[4] Because different penal consequences attend essentially the same conduct, defendant insists this is sufficient to trigger our scrutiny of the classification. Defendant does not dispute that federal and state equal protection guarantees are offended only if the challenged disparity between section 148.1(d) and section 11418.1 bears no rational relationship to a valid state interest. (See U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. a.)

In our earlier opinion we could not divine any plausible reason why a conviction for placing a false bomb without causing sustained fear should subject a defendant to a felony conviction under section 148.1(d) but only a misdemeanor conviction under section 11418.1 for a false WMD, given the goals articulated by the Legislature.[5] The

---

[4] As defendant notes, had he written "anthrax" on the box, he would have been guilty of only a misdemeanor.

[5] In the legislative history for section 11418.1 (Sen. Comm. on Pub. Safety, analysis of Assem. Bill No. 1838 (2001-2002 Reg. Sess.) as amended Mar. 7, 2002), a properly cognizable category of legislative history for judicial notice that we took at defendant's request (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005)

7

fear of a false WMD, given the more far-reaching effects of such devices, would generally be more severe (even in the absence of sustained fear) than the fear of only an explosive device whose destructive effects could be more easily evaded, and yet the former incurs the lesser punishment.

The Supreme Court disagreed. According to the court, "The obvious purpose of *both* statutes is to deter and punish acts that can cause fear and disorder consistent with the criminal intent underlying the planting of the false bomb or the false WMD. (See *People v. Seijas* (2005) 36 Cal.4th 291, 306 [30 Cal.Rptr.3d 493, 114 P.3d 742] [inferring from a ' "common sense reading" ' of § 148.5, which punishes false crime reports to peace officers, that it was meant to prevent ' "the resulting inconvenience and danger" ' to the public].) The requirement that the perpetrator be shown to have caused sustained fear for felony purposes under section 11418.1, but not under section 148.1(d), reflects legislative awareness of the different manner in which false WMD's and false bombs are, or at least may be, perceived.

"As discussed above, ordinary persons recognize bombs, and understand that they can detonate, combust, and explode without warning, in an instant. (See, e.g., [*People v.*] *Heideman* [(1976)] 58 Cal.App.3d 321, 329 [homemade bomb, which consisted of stick

---

133 Cal.App.4th 26, 32-35), the analysis directly poses the question of whether the Legislature should create a new wobbler drawn from section 148.1(d) for placement of false WMDs causing sustained fear, and a misdemeanor when sustained fear is not present. (Sen. Comm. on Pub. Safety, analysis of Assem. Bill No. 1838, *supra*, at pp. 2-3.) According to this analysis, "From discussions with the sponsor of AB 1838, it appears that the new WMD hoax crime was modeled on the bomb threats statute because police and prosecutors are familiar with the existing crime. Further, it was believed that since the conduct in both crimes is similar, the penalties should be similar." (Sen. Comm. on Pub. Safety, analysis of Assem. Bill No. 1838, *supra*, at p. 18, italics added.) In discussing the creation of a new felony in the context of the additional punishment for recidivism, the analysis identified a reluctance to add nonviolent felonies that could be subject to this treatment, but believed the element of sustained fear was equivalent to the harm from violent conduct. (*Id*. at pp. 19-20.)

8

of dynamite to which batteries, mercury switch, and wiring were attached, could be detonated either accidentally or on purpose with blasting caps].)  It is also commonly known that such features give victims little or no chance to escape the bomb's lethal effects.  (See, e.g., [*People v.*] *Morse* [(1992)] 2 Cal.App.4th 620, 633-634 [two members of police bomb squad killed by sudden explosion of pipe bomb being disarmed in defendant's garage].)  Thus, a false bomb planted with the *intent* to cause fear when seen or detected would almost certainly be *expected* to cause fear, including sustained fear. The Legislature could readily conclude that sustained fear is inherent in any bomb threat, and that its presence in section 148.1(d) would add little to the crime, either in felony or misdemeanor form." (*Turnage*, *supra*, 55 Cal.4th at pp. 75-76.)

Finding a rational basis for the challenged disparity, the court rejected defendant's constitutional challenge.  Consistent with the court's decision, we do as well.

B.    Due Process

Defendant also contends the phrase "any false or facsimile bomb" does not adequately describe the type of object coming within its ambit.  He argues that the statute is therefore unconstitutionally vague, both facially and as applied to the facts of this case.

Initially, the People contend defendant has forfeited this claim because he did not raise it first in the trial court.  As defendant correctly points out, where the claim of error does not trample concerns of judicial efficiency, involves only the application of legal principles of law to undisputed facts (without depriving the People of the opportunity to have developed essential facts in opposition), and presents an issue of important public concern (such as the constitutionality of a statute in a case of first impression), we will generally exercise our discretion to allow a party to raise the issue for the first time on appeal.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887-888 & fn. 7 (*Sheena K.*); *In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.)  The case before us satisfies these standards, so we will proceed to the merits.

9

*Facial Vagueness*

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning' " that prevents arbitrary enforcement and gives adequate notice. (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) To be unconstitutionally vague, the statute must employ terms the meaning of which causes people of common intelligence to guess what conduct is either required or prohibited. (*Ibid*.)

Defendant acknowledges that "bomb" is a term of common understanding. (*People v. Dimitrov* (1995) 33 Cal.App.4th 18, 25 ["Persons of common intelligence know what a bomb is"; rejecting claim of need for instructional definition of term as used in § 12301]; *People v. Quinn* (1976) 57 Cal.App.3d 251, 259 [term "bomb" in § 12301 not unconstitutionally vague].) He claims, however, that "false or facsimile" does not adequately limit the entire spectrum of items that are not actual bombs.

Defendant splits hairs in focusing only on the use of the term "false or facsimile bomb" in his claim that one reasonably cannot tell which objects are prohibited. It is not the object alone, but the object coupled with an intent to cause fear in another that is prohibited. If a person of common intelligence understands the nature of a bomb, then that person will know which objects will cause fear in another from their deceptive similarity to a bomb. Defendant or others need not fear that leaving their hats behind will be mistaken for placing a false bomb unless there is some external indication that it contains an explosive and a detonation device. We therefore reject this claim of vagueness.

*Vagueness as Applied to Defendant*

Defendant also argues that the statute is unconstitutional for vagueness as applied to him, as he could not reasonably have known others would consider his object to be a bomb. He asserts in essence that the box at most proclaimed that it might have an explosive inside and did not give any indication of a detonation device.

People of common intelligence now live in a world where they must remove even shoes for screening in airport security because of the possibility that they could contain a concealed explosive device. We are also sadly in an era in which people have expressed their discontent with the government through the destruction of public buildings. Placing an object that at least boasts of its explosive nature near a government building would indicate to anyone of common intelligence that the object could be considered a bomb even without any external indication of a detonation device concealed within. We therefore reject this claim of vagueness.

## II

### A.     Sufficient Evidence—Bomb

Defendant argues the prosecution evidence showed only that he placed a false "explosive," which is not punishable under section 148.1(d). He asserts that expert testimony regarding the features of a bomb was necessary in order to support the jury's verdict that this false explosive was a false bomb. He contends that the "lay opinion[s]" of other witnesses regarding whether his hoax was a bomb are insufficient to support the verdict because they lacked foundation of any prior experience with bombs. Consequently, the court erred in denying his motion to dismiss at the conclusion of the prosecution case.

This was not the actual basis of the motion to dismiss. The motion instead focused on the issue we next discuss, i.e., whether there was sufficient evidence of an intent to instill fear. We will, however, treat this simply as an argument regarding the insufficiency of the evidence.

Defendant's claim regarding the need for expert testimony is in essence a rehash of his argument that the term "false or facsimile bomb" is vague. Jurors of common understanding comprehend that a false bomb must appear to be a device capable of exploding upon the triggering of its fuse. As a result, the jurors were capable of determining by themselves whether the testimony establishing that C-4 is an explosive

11

(including defendant's own admission to that effect) demonstrated that defendant placed a false bomb, without either expert or lay opinion testimony to that effect.

**B.** **Sufficient Evidence—Intent**

Coming to the actual basis of defendant's motion to acquit, he reiterates that the prosecution produced insufficient evidence of his intent to induce fear in another. In this regard, he relies on the innocuous circumstances of the object and its placement, the absence of any particular animus toward the YCCC or any of its employees, the lack of any extreme reaction on the part of YCCC employees, his availability for police questioning afterward, and his self-serving assertion of intending only a joke. The argument lacks merit.

Regarding the appearance and placement of the false bomb, we have already noted that in the present day one can rationally fear that the most innocuous of objects—even shoes—might be a bomb. We have reviewed the pictures of defendant's box in the record. While it might not appear threatening of itself, the context of the placement of a box labeled with the name of an explosive and a flag near the entrance to the unguarded parking lot of a government facility allows for a rational inference that he intended to scare employees driving through the gate. Indeed, even the bomb expert was wary of the object.

It is not necessary that defendant have an animus toward any person in particular at the YCCC. His particular reliance on *People v. Lake* (2007) 156 Cal.App.4th Supp. 1, 9, for this proposition is not well-placed, as the solicitation statute at issue in that case required knowledge of the likely presence at the proposed location of third parties whom the solicited acts would offend.[6] In any event, there was evidence of his irrational need

---

[6] We do not need to respond to his remaining citations to other cases involving other crimes and the insufficiency of evidence of intent in those appellate records. (*State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202 & fn. 5.)

to scare off unspecified individuals at the YCCC in particular, and apparent hostility to county offices in general, as demonstrated in the imaginary rifle incident and his glaring at the police officer at the intersection.

His efforts to minimize the response at the YCCC to his "joke" are unavailing. Both the YCCC and the police treated the object as a bomb, as did the bomb expert.

This leaves his failure to flee the area after placing the bomb, his cooperative response to police questioning, and his disavowal of any intent to scare anyone. We are not obligated to accept his self-serving disavowals of an intent to scare, particularly in light of his admissions of his perceived difficulties with officers that he needed to scare.

### III

### Sufficiency of "Strike" Evidence

Defendant argues there is not sufficient evidence to prove a 1985 prior "strike" conviction because in 1978 he was found not guilty by reason of insanity (NGI). The evidence in the record regarding the NGI finding is confusing. There is documentary evidence indicating that in May 1978 charges of battery and assault with a deadly weapon on a peace officer or firefighter against defendant were resolved by an NGI finding and he was committed to Napa State Hospital. (§ 1026.) However, there is a document, relied on by the People, that indicates the court suspended the criminal proceedings on a finding of defendant's then-present incompetence to stand trial. (§ 1367 et seq.) Entries in defendant's summary criminal history from the Department of Justice contradict this document, however. Although the summary does not include an entry for a 1978 commitment (as it does for later commitments indicating either § 1026 or § 1370 as the basis), it does show a series of arrests and convictions in 1981 before a commitment to Atascadero State Hospital on October 29, 1982, pursuant to section 1026 (which is not a disposition ordered in any of the 1981 incidents), and the People do not explain how defendant would have been at liberty in 1981 if the criminal proceedings had merely been suspended in 1978 until he regained competence to stand trial.

13

Moreover, on March 28, 1985 (the date listed on the summary criminal history for his discharge from Atascadero), there was a hearing at which the People "concede(d) a Petition for Writ of Habeas Corpus," pursuant to which the court allowed defendant "to withdraw his plea of [NGI]" and enter pleas of guilty to a violation of section 245 with a firearm use allegation and a violation of section 243 in exchange for the court's sentencing him to time already served. Defense counsel represented that she had explained to defendant that if he did not set aside his plea there would not be any conviction and he was likely to prevail on his "Petition for a trial" to obtain his release in the near future. However, "[h]e has indicated to me that he is not interested in having the trial. He understands that he might get out and would then have no conviction, but he wants to go ahead on this." The court accepted his plea and initially imposed a sentence of five years for the assault and stayed sentence on the battery (noting that he would "be released this afternoon"). It later amended the term to four years.

In their initial response, the People urged us to interpret these documents as indicating that criminal proceedings were suspended in 1978 and reinstituted at some subsequent point.

Following remand, we took judicial notice of a 1985 nonpublished opinion of the First District Court of Appeal in which defendant's commitment to Napa State Hospital after being found not guilty by reason of insanity is noted. We requested the parties to file letter briefs discussing the significance of the opinion. In response, the People requested that we also take judicial notice of various documents establishing that on May 3, 1978, defendant was found not guilty of the underlying charge by reason of insanity, but was permitted to withdraw his NGI plea on March 28, 1985, and enter a plea of guilty. The People's request is granted. While this information is at odds with the People's representations at trial, the People nonetheless argue that it supports the prior conviction finding and urge that we affirm. However, in light of the confusing evidence presented to the trial court and the People's apparent concession that some of the

14

evidence on which it relied was misleading, the better course of action is to reverse the prior conviction finding and remand the case to the trial court for a retrial of the prior conviction allegation. (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1455.) The trial court may consider the additional evidence proferred by the People and the conflicting arguments offered by both sides as to the legal effect of such evidence.

## IV

Defendant asserts that if we reverse his conviction for placing a false bomb, then we must vacate the finding of a violation of probation and remand because it is not clear whether the court based its finding on the mere fact of his conviction rather than on the evidence adduced at trial. (Compare *People v. McNeal* (1979) 90 Cal.App.3d 830, 840, fn. 3 [where court affirmatively indicates it relied on *evidence* rather than mere fact of conviction, no need to vacate and remand finding of probation violation]; *People v. Hayko* (1970) 7 Cal.App.3d 604, 611 [only specified basis for finding of probation violation was fact of conviction; must vacate and remand].)

Defendant is not entitled to a *reversal* of his conviction. We therefore reject this argument.

## DISPOSITION

Defendant's sentence is vacated, the true finding as to the allegation that defendant suffered a 1985 conviction for assault with a deadly weapon is reversed, and the matter is remanded for a retrial as to that allegation. In all other respects, the judgment is affirmed.

                                    RAYE         , P. J.

We concur:

        BUTZ        , J.

       MURRAY    , J.



Appendix A

16