Filed 7/16/13  P. v. Hammond CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ALLEN HAMMOND,<br><br>Defendant and Appellant. | F064020<br><br>(Super. Ct. No. VCF256413)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gerald F. Sevier, Judge.

Gabriel Bassan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Rebecca Whitfield, and Charity Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Robert Allen Hammond was charged with assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) with a special allegation that he personally used a deadly weapon in the commission of the offense (§ 969f), two counts of making criminal threats (§ 422) with a special allegation that defendant personally used a deadly weapon during the commission of the offenses (§ 12022, subd. (b)(1)), dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)), assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)), corporal injury to a spouse (§ 273.5, subd. (a)), and resisting a peace officer (§ 148, subd. (a)(1)).  Prior to trial, defendant pled no contest to the resisting arrest charge.  After trial, the jury found defendant guilty of the criminal threats and dissuading a witness charges, but found defendant not guilty of the remaining charges and allegations.  The jury also acquitted defendant of all lesser included offenses with the exception of simple assault (§ 240) as it related to the assault by means likely to produce great bodily injury charge; as to that lesser offense, the jury declared it was hopelessly deadlocked and the trial court declared a mistrial.  The prosecution subsequently dismissed that count.

The trial court sentenced defendant to a total term of three years four months, consisting of a two-year term for one of the criminal threats charges and consecutive eight-month sentences for each of the remaining charges.  Execution of the sentence was suspended and defendant was placed on probation for a three-year term with the condition that he serve 365 days in the county jail.

Defendant appealed and contends the trial court committed prejudicial error as follows:  (1) by admitting evidence relating to marital infidelity that was irrelevant and unduly prejudicial, (2) by instructing the jury that evidence could be used to establish his state of mind, and (3) by sentencing him to consecutive terms on the criminal threats and dissuading a witness charges.  In addition, he claims that the prospective application of

---

[1]All further references are to the Penal Code unless otherwise indicated.

recent amendments to section 4019 violate principles of equal protection and that he is entitled to additional conduct credits. We agree the trial court erred in sentencing defendant on both the criminal threat and dissuading a witness charges as they relate to the same act and same victim. We reject defendant's remaining contentions.

**FACTS**

Defendant and Melissa Hammond (Melissa) were married on April 1, 2011. The two lived together in their home along with Melissa's son, Joshua Taylor, and his two children. Taylor and his children had moved into the home approximately two weeks before the incident at issue.

During the morning hours of August 13, 2011, defendant sent Melissa a text message asking to talk to her about some marital issues. Melissa agreed to talk to him and the two went into the backyard after defendant returned home from some early morning errands. While outside, the two began to argue over an accusation Melissa made to defendant about his infidelity. The argument became heated. During the argument, defendant destroyed some items from within the home and also smashed Melissa's wedding ring with a hammer. Defendant then accused Melissa of having sex with Taylor. Specifically defendant said, "'Are you fucking your son?'" and then stated, "'I think you are because I'm not getting any pussy. I think there's some fucking incest going on.'" Melissa told defendant not to let Taylor hear such an accusation or he would "cause trouble."

Defendant went inside the home to confront Taylor, locking Melissa outside. Melissa retrieved her keys and went inside after defendant, finding him in Taylor's room accusing him of sleeping with Melissa. Taylor told defendant to leave the room so as not to wake his sleeping children. Melissa turned briefly and when she looked back she saw defendant punch Taylor in the face.

Defendant and Taylor then began to wrestle in the hallway and Taylor yelled for Melissa to call 911. Melissa turned to find a phone and heard glass breaking. When she

looked back, Melissa saw Taylor on all fours on the ground with glass on his body. Defendant was standing over Taylor, beating him. Melissa attempted to intervene by running into defendant. In response, defendant struck Melissa in the head, pulled her down by her hair, and began striking her on her legs. During the altercation, Melissa scratched defendant's face in an effort to stop him from hitting Taylor.

While defendant was hitting Melissa, Taylor escaped and ran outside. Defendant chased after Taylor, at one point grabbing him by the shirt and ripping it off his body. Once outside, defendant continued to attack Taylor, who was on the ground trying to protect his head. At that point, Melissa ran back inside to the kitchen looking for her phone so she could call the police.

Melissa was in the kitchen and Taylor ran by, yelling for her to call the police. Defendant also ran by the kitchen but Melissa was able to stop him and asked him why he was doing this. Defendant entered the kitchen and said "this is your fault, why couldn't you just believe me. You should have just believed me." Defendant pushed Melissa up against the sink. About that time, Taylor yelled at Melissa to get away from defendant and stated either he had or was just about to call the police. Defendant responded, "if you call the cops … I will kill you and your cunt ass mom." Melissa went toward Taylor when defendant picked up a knife that was on the counter and made a jabbing motion with it toward Taylor, coming within inches of him. Melissa was between Taylor and defendant, and defendant reached over Melissa in an effort to attack Taylor. Subsequently, defendant dropped the knife and told Taylor "let me talk to you, bitch" and chased Taylor outside again.

Melissa followed, and defendant ultimately ran back inside, locking the door. As a result of the incident Melissa suffered a lump on her head, had some of her hair torn out, and had bruising on her legs and arm.

Taylor testified that on the day in question he was in his room with his sleeping children when defendant barged in and accused him of having sex with Melissa. Taylor

4.

told defendant he was crazy and told him to leave. Defendant and Taylor were face-to-face and defendant made a reaching motion toward Taylor's sleeping son. Taylor pushed defendant's arms away from the child and told him to stop. At that point defendant punched Taylor in the face and the two began to wrestle in the hallway. While on the ground in the hall, defendant beat Taylor, punching him in the head, neck, ribs, and back. When Taylor tried to get up to run, he felt defendant hit him with a picture frame and felt glass break on the back of his head. The two rolled around on the floor exchanging punches while Taylor yelled for Melissa to call the police.

Taylor then saw Melissa attempt to intervene and saw defendant strike Melissa. He saw defendant pull Melissa by the hair and punch her in her legs. Taylor was able to get up and run outside but defendant followed. Once outside, defendant was able to catch Taylor and again began beating him while Taylor was on the ground trying to protect himself. Taylor was able to get up and run back inside to look for his phone to call the police. Taylor went into his room and when he came out he met defendant in the hallway. Once again Taylor went to the ground while defendant continued to beat him. Taylor was able to get away and run into the kitchen where he found Melissa. Defendant followed him into the kitchen and began arguing with Melissa while Taylor left the room to look for his phone. When Taylor returned to the kitchen, he saw defendant and Melissa arguing. Taylor told defendant that he was calling the police and defendant said "'if you call the cops, I'll kill you and your cunt ass mom'" and grabbed a knife and began making stabbing motions toward him over Melissa.

Defendant dropped the knife and told Taylor "come here, you little bitch, let me talk to you." Taylor went outside and defendant followed, telling him not to call the police. Defendant then said if Taylor was going to call the police, then he would as well. While on the phone with the police, defendant attempted to assault Taylor again. Defendant ran inside the house and locked the door. Fearing for his children's safety,

5.

Taylor went to the front of the house and kicked open the front door. While Taylor was on the phone with the dispatcher, he noticed that defendant was also calling the police.

Taylor stated that the only time he ever punched defendant during the fight was after defendant hit him with the picture frame. Other than that incident, Taylor never punched defendant. As a result of the incident Taylor sustained scratches to his back and neck, lumps to the back of his head, lacerations to his ear, knee and foot injuries, a slightly black eye, and bruising to his ribs. He did not require any medical treatment.

Police Sergeant Derrick Porter was dispatched to the home at approximately 11:30 a.m. He spoke to defendant who was calm at the time and to Melissa who was very upset and shaking. He found picture frames and glass on the floor of the home and a knife on the kitchen counter. Although Sergeant Porter collected the knife, he did not have it analyzed for fingerprints. He did not see any injuries to Melissa's head, but did notice an injury to her arm. Defendant had scratches to his face, neck, and back.

Police Officer Ryan Willcutt also responded to defendant's home. He noted that Taylor was out of breath and had swelling and a cut to his left eye. In addition he had red marks, scratches, and bruises to his back, ribs, and upper torso. He also had an injury to his right ear which appeared consistent with being cut by glass. Defendant did not have any injuries to his head, but did have scratches to his face, a cut on his hand, scrapes on his leg, and redness on his forearm.

### Defense Case

Defendant testified that prior to the incident, he and Melissa were having problems in their marriage, and Melissa had accused him of infidelity. Once Taylor moved into the home, defendant noted there was no longer a physical relationship between him and his wife. On the date in question, he talked to Melissa about their marriage and ultimately asked her if she wanted a divorce. She responded that she did and threw her ring at him. Defendant smashed the ring with a hammer and shortly thereafter accused Melissa of sleeping with Taylor. Melissa challenged defendant to ask that question to Taylor, noting

6.

that Taylor would "probably knock your f'ing teeth out of your head" for making such an accusation.

Defendant went to Taylor's room and told him they needed to talk. He asked Taylor to leave the room since the children were sleeping, but Taylor refused. When defendant asked Taylor if he was sleeping with Melissa, Taylor attacked him, knocking him into the hallway. Taylor then began beating defendant and defendant began to defend himself. During the fight, Taylor struck defendant with the picture frame, breaking the glass. The fight continued. Eventually, defendant followed Taylor into the backyard. Taylor was running from defendant and defendant was telling him he wanted to talk. In the backyard the two got into a tussle and, eventually, Taylor went back into the house.

Defendant followed and went into the kitchen where he found Melissa and Taylor. While in the kitchen, Taylor picked up a knife from the counter and began making jabbing motions toward defendant. Melissa was between Taylor and defendant, and defendant used Melissa as a shield so that Taylor would not stab him. Taylor threw the knife down and all three proceeded to the backyard where Taylor called 911. Defendant also attempted to call 911 but Taylor slapped the phone from his hand. Defendant retrieved his phone and was able to call the police as well.

As a result of the fight defendant suffered cuts to his face, as well as redness to his chest, shoulders, and stomach. Defendant did not know how Melissa received any injuries. He testified that he never struck her intentionally, but speculated that she could have been injured when she tried to break up the fight. Defendant denied ever making any threats to Melissa or Taylor. He admitted hitting Taylor, but only in self-defense.

Defendant denied being unfaithful to his wife in a physical manner although he did admit to speaking to other women. Defendant stated that during the argument he was hurt as he felt his marriage was ending. When defendant smashed Melissa's ring and

7.

destroyed items within the house, he did that out of hurt rather than anger, although he admitted he was "probably" a little angry.

## DISCUSSION

### I. The Trial Court Properly Admitted Evidence of Defendant's Alleged Infidelity

Defendant argues admission of evidence that Melissa accused him of infidelity was irrelevant and highly prejudicial. Further, he argues the limiting instruction permitting the jury to consider the evidence for his state of mind was improper and prejudicial. We find no error in the admission of the evidence and the limiting instruction to the jury. Consequently, we need not consider defendant's alternative contention that trial counsel was ineffective.

*Procedural background*

Before trial, the defense moved to exclude any evidence relating to prior alleged acts of infidelity, claiming the evidence had "no probative value" and was highly prejudicial. In preliminary discussions of the issue, the prosecution argued the accusations leading up to the physical fight were relevant to explain defendant's conduct of accusing Taylor of having sex with Melissa. The prosecutor explained the argument began because of "defendant's infidelity, and that's when he accused [Melissa] of sleeping with her son, and that we feel is relevant to come into the trial." As the prosecutor made clear, it was defendant's accusation that Taylor and Melissa were sleeping together that caused the physical fight at issue. Both parties and the court agreed that this accusation was in fact relevant to the trial and defendant does not seem to dispute that relevancy on appeal.

The prosecutor further pointed out that defendant's alleged infidelity was also relevant because it was the basis for the argument, and it was the accusation of defendant's infidelity that precipitated defendant's accusation against Melissa and Taylor. The court initially questioned the relevance, noting "so there's an argument. The reason

8.

for the argument seems inconsequential *unless somehow it's tied to the assertions that [defendant] allegedly is making about his wife and Mr. Taylor*." (Italics added.) The prosecutor argued that was exactly why the statements were relevant, that the accusation of defendant's infidelity led to the accusation that Melissa and Taylor were involved in a sexual relationship. Furthermore, the prosecutor pointed to Melissa's testimony from the preliminary hearing explaining that defendant himself referenced this accusation during the actual assault, telling her "'This is your fault. Why didn't you just believe me?'" These statements occurred immediately before the threat. The court took the matter under submission.

When the court reconvened, it inquired into when the accusation of infidelity took place in relation to the assault. The prosecutor explained that defendant and Melissa were discussing that issue when defendant accused her of having sex with Taylor. The prosecutor also directed the court to portions of the preliminary hearing transcript where Melissa referenced the issue of infidelity in relation to the assault and threats in this case. The court then announced its tentative ruling, noting that "it seems as if it's reflective on some part of [defendant's] state of mind and … that it's relevant circumstantial evidence as to other issues. [¶] That's … what it seems at first blush. I will take a look at the testimony." The prosecutor clarified that the evidence would also go to defendant's motive in addition to his state of mind, and the court acknowledged it understood the argument. The following day after reviewing the testimony at the preliminary hearing, the trial court ruled that the evidence of the infidelity was admissible, finding it was an integral part of the argument and invited counsel to propose a limiting instruction.

During the instruction conference, the defense proposed using CALCRIM No. 303, the limited purpose instruction, as to the evidence relating to defendant's infidelity. The court stated it would give the instruction as proposed.[2] While reading the

---

[2]It appears the proposed instruction initially read as follows: "During the trial, certain evidence was admitted for a limited purpose. Specifically, evidence regarding [defendant]'s

proposed instruction to the jury, the court stopped and had a sidebar conference with the parties. During that discussion, the court noted that part of the reason the court admitted the evidence was to show defendant's state of mind during the argument, which was not reflected in the proposed instruction. The court then modified the instruction to allow the jury to consider the evidence for that purpose. Defense counsel seemed to concede that was part of the purpose for which the evidence was admitted.[3]

Defendant argues the evidence of his alleged infidelity was admitted solely for the purpose of explaining the context of the underlying argument. We disagree with this premise. As is apparent from the entire in limine discussion, the ruling, and the court's comments during the instruction, the evidence was admitted for two reasons: (1) to show the context of the argument, specifically, how defendant came to accuse Melissa and Taylor of engaging in sexual relations, and (2) to demonstrate his state of mind at the time of the offense. Keeping these purposes in mind, we now turn to the propriety of this ruling.

*Analysis*

The trial court admitted the evidence of defendant's infidelity to show the context of the argument and to show defendant's state of mind. This ruling was not error. Defendant argues the subject of the argument was inconsequential, therefore, the evidence was irrelevant. Further, he contends, allegations of his infidelity were irrelevant to his state of mind at the time of the offense. Defendant is mistaken on both points.

---

alleged actions with other women was admitted to show the context of his argument with Melissa Hammond. You may consider that evidence only for that purpose and for no other."

[3]The following exchange took place during the sidebar:

"THE COURT: Actually, part of the reason I admitted that was to show his state of mind.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: So—

"[DEFENSE COUNSEL]: That's fine.

"THE COURT: —so add in state of mind? Okay."

Evidence Code section 351 provides that "all relevant evidence is admissible," unless it is otherwise prohibited. Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Evidence is relevant if it tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" (*People v. Williams* (2008) 43 Cal.4th 584, 633-634.) A trial court enjoys broad discretion in determining the relevancy of evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 727.) We review a trial court's rulings on relevance and the admissibility of evidence for abuse of discretion. (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 973.)

Defendant argues that in addition to being irrelevant the evidence was also unduly prejudicial under Evidence Code section 352. Similar to the determination of relevance, the trial court has broad discretion in determining "whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time" under Evidence Code section 352. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) The court's ruling under this section will be upheld unless it constitutes an abuse of discretion. (*Id*. at p. 1124.) Under this deferential standard of review, a trial court's ruling will "'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid*.)

Reviewing the evidence under the above standards, it is clear the trial court did not abuse its discretion in permitting the evidence of defendant's infidelity on the limited issues of providing the context of the argument and on the issue of defendant's state of mind. Evidence of infidelity is admissible when relevant to prove the state of the marital relationship and therefore to prove a motive to commit the underlying crime. (*People v. Houston* (2005) 130 Cal.App.4th 279, 307.)

11.

Here the evidence was admitted to explain the context of the argument as well as defendant's state of mind at the time of the offense. It is apparent the argument began over the allegation of defendant's infidelity. In response, defendant accused Melissa of being unfaithful and of incest. He then accused Taylor of having a sexual relationship with Melissa, which was the direct cause of the physical altercation. Therefore, the allegation of infidelity was the precipitating event of the offenses at issue and tended to explain why defendant accused Taylor of sexual relations with Melissa. Thus, the argument was so intertwined with the physical fight that they could not be separated from each other. In this context, the reason for the fight is relevant.

Defendant argues the subject of the argument itself was irrelevant because there was no dispute that an argument took place. We disagree. As trial counsel conceded, defendant's accusation against Taylor was, in fact, relevant to the subsequent conduct. Likewise, the accusation that precipitated defendant's conduct was relevant to explain the context of the argument and defendant's subsequent actions. This is apparent from the fact that during the physical fight and immediately preceding the threats defendant references the allegation himself by telling Melissa that the fight was her fault and she should have just believed him. This demonstrates the underlying accusation of infidelity was inextricably intertwined with what happened afterward.

On this point, *People v. McKinnon* (2011) 52 Cal.4th 610 is instructive. There, the defendant was convicted of murder after evidence established he walked up to the victim and shot him after stating, "'This is for Scotty.'" (*Id*. at p. 655.) During trial, gang evidence was introduced to show the defendant's motive and intent for murdering the victim and to give meaning to the defendant's statement. (*Ibid*.) The California Supreme Court held the trial court's admission of the evidence was proper as it was probative of the defendant's motive for the shooting and explained his statement. Further, the court found the evidence was not unduly prejudicial as it focused on the reason the defendant may have wanted to kill the victim. (*Id*. at p. 656.) Likewise here, the evidence of

12.

Melissa's accusation that defendant had been unfaithful provided a context for the argument as well as defendant's specific statements during the crime.

In addition, the evidence had a tendency to demonstrate defendant's state of mind during the crimes. To establish a violation of section 422, the prosecution must prove, among other things, "that the defendant made the threat 'with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out.'" (*People v. Toledo* (2001) 26 Cal.4th 221, 228.) "A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)

Despite defendant's argument to the contrary, it is apparent defendant's state of mind was relevant to the charged offenses. The evidence that Melissa accused defendant of cheating was circumstantial evidence of his state of mind, which is relevant to the charges in the case. It explains the situation and the reason defendant threatened the victims. It also tended to show that defendant was angry. Of course, his anger was relevant as to whether he made the threats in issue.

Melissa accused defendant of cheating and, in response, he accused Melissa of having sexual relations with Taylor. Next, defendant confronted Taylor and a physical fight ensued. At that point, defendant blamed Melissa for starting the fight, he told her the situation was her fault and had she just believed him, the fight would not have happened. He then made the threat that he would kill the victims. The circumstantial evidence of defendant's anger toward Melissa at the time as well as his intent to make the threat had some tendency to prove that defendant was so upset with Melissa that he intended for his threat to be taken as a threat. Therefore, the evidence was relevant to defendant's state of mind at the time of the offense.

Defendant further argues the evidence was unduly prejudicial, amounting to an attack on his character. In support of his argument, he relies upon *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011. That case is inapposite. In *Winfred*

13.

*D*., the plaintiff sued the defendant tire company, alleging a tire defect caused an accident leaving the plaintiff severely injured. (*Id*. at p. 1014.) The defense claimed the accident was not caused by a tire defect, but rather from the plaintiff's action in overloading the vehicle. (*Ibid*.) During the trial, the defendants were permitted to introduce evidence that the plaintiff had an affair while married to his first wife, he later married his mistress without divorcing his first wife, and that he subsequently had an affair with yet another woman, resulting in the birth of two children. (*Ibid*.)

The appellate court held the admission of such evidence was irrelevant to the underlying proceedings, and to the extent that it could be considered relevant, the probative value was far outweighed by its prejudicial impact resulting in a miscarriage of justice. (*Winfred D. v. Michelin North America, Inc.*, *supra*, 165 Cal.App.4th at p. 1014.) As is relevant to our discussion here, the defendants sought to introduce the evidence to explain the plaintiff's motive to overload the van. The defendants theorized the plaintiff had an incentive to overload the van so he could make more money because he had two families to support. (*Id*. at p. 1037.) The appellate court recognized that such evidence could be relevant to establish his financial condition; however, virtually no financial evidence was presented in that case. (*Ibid*.) Based upon the evidence, probative value was quite weak, while the prejudicial impact was significant. (*Id*. at pp. 1037-1038.) As the court explained, "[f]rom start to finish, [the defendants] painted [the plaintiff] as a liar, cheater, womanizer, and man of low morals based principally, if not solely, on what we have concluded was inadmissible evidence." (*Id*. at p. 1038.)

Unlike the situation in *Winfred D*., the evidence here was in fact probative of defendant's state of mind at the time he committed the crimes and provided the context for both the argument and for defendant's statements during the argument. Also unlike *Winfred D*., the evidence here was not unduly prejudicial. The evidence consisted only of Melissa's statements that she believed defendant was having an affair and her testimony that he had admitted certain conduct to her. Defendant also testified Melissa

14.

had accused him of being unfaithful, and he conceded he had spoken to other women and admitted that to her. No collateral evidence of any infidelity was ever produced at trial, nor was there any coordinated and pervasive attack on his character. It certainly was not akin to the pervasive use of the evidence as in *Winfred D*. Indeed, the prosecution never commented on the alleged infidelity in either its closing or rebuttal arguments. Considering the relevancy of the evidence as stated above and the limited prejudicial impact, we cannot find the admission of the evidence was so arbitrary, capricious, or patently absurd as to constitute an abuse of discretion.

Defendant goes on to contend the trial court erred by modifying the proposed limiting instruction and allowing the jury to consider the evidence relating to infidelity for defendant's state of mind. However, as we have already explained, the evidence was properly admitted as relevant to defendant's state of mind. The trial court's modification of the instruction simply reflected the proper purpose of the evidence. Indeed, defendant does not contend the instruction itself was somehow flawed; rather, his argument rests solely upon his contention the jury should not have been allowed to consider the evidence in relation to his state of mind. As the instruction properly limited the use of the evidence, we find no error.

## II. Defendant Cannot Be Sentenced for Both Criminal Threats and Dissuading a Witness Pursuant to Section 654.

Defendant contends his convictions for criminal threats against Taylor and dissuading him as a witness are based upon the same conduct and are both incident to the same intent and objective. He concludes he may not be separately punished for both crimes under section 654. We agree.

Section 654 provides in pertinent part:

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

15.

"The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense—the one carrying the highest punishment. [Citation.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

> "If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Liu*, *supra*, 46 Cal.App.4th at p. 1135.)

Section 654 "does not allow any multiple punishment, including either concurrent or consecutive sentences." (*People v. Deloza* (1998) 18 Cal.4th 585, 592.)

Here, defendant was convicted of criminal threats and dissuading a witness for a single act. The conduct that was the subject of the crimes was defendant's statement to the victims that "'if you call the cops … I will kill you and your cunt ass mom.'" Defendant's threat was made expressly contingent upon calling the police, thus it is obvious the threat was incidental to the main purpose of dissuading Taylor from calling the police.

Indeed, other courts have made the same finding on similar facts. In *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1346, superseded by statute on other grounds as stated in *People v. Franz* (2001) 88 Cal.App.4th 1426, 1442, the court held that the defendant could not be sentenced for both making a threat and dissuading a witness based upon the same threat against a witness who had previously testified against his brother. Likewise, in *People v. Louie* (2012) 203 Cal.App.4th 388, 394, 399, the court held that the defendant's act of pointing a gun at the victim, calling her "a cop-calling bitch," and

16.

threatening her constituted a single act within the meaning of section 654 and, therefore, he could not be punished for both crimes.

Because defendant's actions of threatening and dissuading Taylor consisted of a single act with a single intent and objective, he cannot be sentenced for both offenses. (*People v. Mendoza*, *supra*, 59 Cal.App.4th at p. 1346; *People v. Louie*, *supra*, 203 Cal.App.4th at p. 399.)  Consequently, the sentence on count 4 must be stayed pursuant to section 654.[4]

## III.    Defendant Was Awarded the Proper Amount of Conduct Credits

Defendant contends he should be awarded additional presentence credits based upon the amendments to section 4019 that became operative on October 1, 2011.  He argues failure to award retroactive credit constitutes a violation of equal protection principles.  He further argues he should receive enhanced credits for the actual time spent in custody after October 1, 2011, claiming the statutory language is ambiguous.  This court has previously addressed, and rejected, the specific arguments raised by defendant in our decision in *People v. Ellis* (2012) 207 Cal.App.4th 1546 (*Ellis*), and thus we reject them again here.  (See also *People v. Brown* (2012) 54 Cal.4th 314; *People v. Kennedy* (2012) 209 Cal.App.4th 385.)

Section 4019, subdivision (h) specifically states that the changes increasing the amount of conduct credits apply prospectively only.  In *Ellis*, we concluded the intent of the Legislature "was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011.  [Citation.]" (*Ellis*, *supra*, 207 Cal.App.4th at p. 1553.)  It is undisputed that defendant committed his offenses well before this date.

---

[4]Although defendant was ultimately placed on probation in this case, we note the trial court actually imposed the sentence but suspended its execution prior to placing defendant on probation, thus making the issue ripe for review.  (See *People v. Fry* (1993) 19 Cal.App.4th 1334, 1340.)

17.

"The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.]" (*People v. Brown*, *supra*, 54 Cal.4th at p. 328.) Reviewing courts determine whether groups are "similarly situated" in the specific context of the law being challenged, not whether the groups are "similarly situated" in all respects. (*Ellis*, *supra*, 207 Cal.App.4th at p. 1551.)

In *People v. Brown*, the California Supreme Court noted that the purpose of section 4019 is to authorize incentives for good behavior.[5] This goal is not served "'by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response….'" (*Ellis*, *supra*, 207 Cal.App.4th at p. 1551, quoting *People v. Brown*, *supra*, 54 Cal.4th at pp. 328–329.) Therefore, prisoners who served time before and after amendments to section 4019 are not "similarly situated" for equal protection purposes. (*Ellis*, *supra*, at p. 1551.) Because defendant fails to show section 4019 treats "similarly situated" groups unequally, he asserts no cognizable equal protection claim.[6]

---

[5]*People v. Brown* dealt with a different amendment to section 4019 but we apply its reasoning to the October 1, 2011, amendments to section 4019 that are at issue here. (See *Ellis*, *supra*, 207 Cal.App.4th at pp. 1551–1552.)

[6]Defendant does not seem to make an equal protection claim for the time served only after October 1, 2011, the date upon which the amended section 4019 took effect. To the extent that defendant can be considered to make that claim, we note the court in *People v. Rajanayagam* (2012) 211 Cal.App.4th 42 rejected a similar claim. Although the *Rajanayagam* court found that defendants who served time in jail on or after October 1, 2011, regardless of the date they committed their offenses were indeed similarly situated for purposes of equal protection, the court nevertheless held there was no equal protection violation as there was a rational basis for the legislative classification. (*Id*. at pp. 53-56.) As the court explained, the legislative purpose behind the amendment at issue is "'to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending.'" (*Id*. at p. 55.) The court concluded "the classification in question does bear a rational relationship to cost savings." (*Ibid*.) Therefore, the defendant's equal protection rights were not violated. (*Id*. at p. 56.) Assuming defendant is making a similar argument here and assuming this court were to agree with *Rajanayagam* that the two groups in that situation are similarly situated, we would agree there is a rational basis for the classification. Thus, we find no equal protection violation.

Likewise, defendant's argument that he is entitled to enhanced conduct credits for the period between October 1, 2011, and the date he was subsequently sentenced was considered and rejected in *Ellis*. As we explained in *Ellis*, the statutory language on this point is not ambiguous. (*Ellis*, *supra*, 207 Cal.App.4th at pp. 1552-1553.) Thus, for the reasons stated in *Ellis*, we reject defendant's claim.

## DISPOSITION

The judgment is modified to stay the term on count 4, dissuading a witness (§ 136.1 subd. (b)), pursuant to section 654.[7] The trial court is ordered to amend the sentencing minute order reflecting this modification. In all other respects, the judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
FRANSON, J.

---

[7]As the trial court suspended execution of sentence and placed defendant on probation, this modification will only affect defendant if he subsequently violates probation and is sentenced to prison.